Filed:  February 14, 2001

              UNITED STATES COURT OF APPEALS

                 FOR THE FOURTH CIRCUIT
              ─────────────────────

                      No. 00-4263
                    (CR-99-235-DKC)
              ─────────────────────


United States of America,

                              Plaintiff - Appellee,

          versus


Kingsley Obi, etc.,

                              Defendant - Appellant.



              ─────────────────────

                     O R D E R

              ─────────────────────


     The court amends its opinion filed February 8, 2001, as
follows:

     On the cover sheet, section 7, lines 1 and 4 -- counsel's firm
name is corrected to read "Bennett & Nathans, L.L.P."

     On the cover sheet, section 7, line 4 -- counsel's name is
corrected to read "Jason C. Tulley."

                              For the Court - By Direction



                              /s/ Patricia S. Connor
                              Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 00-4263

KINGSLEY OBI, a/k/a Obi Kingsley,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-99-235-DKC)

Argued: December 8, 2000

Decided: February 8, 2001

Before NIEMEYER and MOTZ, Circuit Judges, and
James C. CACHERIS, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Motz and Senior Judge Cacheris joined.

_____

COUNSEL

ARGUED: Fred Warren Bennett, BENNETT & NATHANS, L.L.P.,
Greenbelt, Maryland, for Appellant. Ronald Jay Tenpas, Assistant
United States Attorney, Greenbelt, Maryland, for Appellee. ON
BRIEF: Jason C. Tulley, BENNETT & NATHANS, L.L.P., Greenbelt,
Maryland, for Appellant. Lynne A. Battaglia, United States Attorney,

Sandra Wilkinson, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

Kingsley Obi appeals his convictions on four counts charging him with heroin distribution, in violation of 21 U.S.C. § 841(a)(1), and one count charging him with conspiracy to distribute heroin, in violation of 21 U.S.C. § 846. In his appeal, he challenges: (1) the district court's decision to give a jury instruction on the significance of his attempted flight while being arrested; (2) the indictment's failure to charge him with the amount of drugs for which he was sentenced; and (3) two evidentiary rulings. Because we conclude that no reversible error was committed, we affirm.

I

During the period from May 1998 to May 1999, Obi allegedly participated in a conspiracy to distribute heroin in Maryland. In May 1998, he was arrested when attempting to pick up a Federal Express package containing 1.4 kilograms of heroin at his former girlfriend's apartment in Wheaton, Maryland. After he was released from custody, he allegedly supplied heroin to Mohammed Sallah, a co-conspirator, who in turn sold the heroin to an undercover police officer on October 14, 1998 (97.8 grams), October 27, 1998 (97 grams), May 4, 1999 (47.4 grams), and May 7, 1999 (248 grams). Obi was indicted for conspiracy to distribute heroin and for distributing heroin on the dates when heroin was sold to the undercover police officer.

At trial, the government presented evidence that Obi arranged to have heroin shipped in May 1998 to the apartment of his former girlfriend, Nkumu Ilongoyi. The package, shipped via Federal Express from the Philippines to a fictitious name at Ilongoyi's address, contained pots with false bottoms concealing 1.4 kilograms of heroin. After U.S. Customs Service agents intercepted the package, they removed all but a small amount of the heroin from the pots and

2

resealed the package. They then made a "controlled delivery" of the package in which a federal agent posed as a Federal Express delivery person and other law enforcement officials conducted surveillance. Ilongoyi's sister accepted the package and departed almost immediately thereafter, leaving the package unopened inside Ilongoyi's apartment. The sister met Ilongoyi outside the apartment building and the two drove off together, at which point the federal agents stopped and questioned them. Ilongoyi told the agents that Obi had arranged to have the package sent to her apartment and was coming soon to pick it up. The agents then took Ilongoyi and her sister back to Ilongoyi's apartment and waited for Obi to arrive. When he did, they arrested him.

Following his arrest, Obi was incarcerated in a Montgomery County, Maryland, holding facility with Mohammed Sallah, where the two became friends. Following their respective releases, Obi returned to his home in Chicago, while Sallah remained in Maryland.

A few months later, Sallah sold heroin to undercover detective Tom Roberts of the Montgomery County Police Department on four separate occasions between October 1998 and May 1999. During this period, Officer Roberts recorded conversations with Sallah in which Sallah provided indications that Obi was Sallah's supplier for the heroin. Sallah told Roberts that his supplier was from Chicago, where Obi was living at the time; that his source did not like to use the mail to send drugs; and that his source "just got caught here in Wheaton," a possible reference to Obi's May 1998 arrest following his attempt to pick up the Federal Express package. There was also evidence that between May 4 and May 7, 1999 -- the period between two of the transactions -- Obi and Sallah exchanged 50 telephone calls. One of these calls was recorded when Sallah, then cooperating with police, called Obi and told him that undercover detective Roberts had not brought all the money for the May 7 deal. Obi responded, "How much did he bring?" indicating his familiarity with the drug deal. Finally, approximately half of the marked government funds used by Officer Roberts to make the May 4 purchase were found in Obi's possession when he was arrested on May 7, 1999.

Obi was convicted on all five counts, and on May 20, 2000, the district court sentenced him to 200 months imprisonment and five years supervised release. This appeal followed.

3

II

Obi contends first, based on the evidence presented at trial, that the district court abused its discretion by giving a jury instruction that characterized Obi's conduct when being arrested outside Ilongoyi's apartment in May 1998 as attempted flight and that the giving of the flight instruction was prejudicial. The government argues that the evidence presented at trial was sufficient to justify giving the flight instruction.

The evidence shows that after Obi knocked on the door to Ilongoyi's apartment in May 1998, apparently to pick up the Federal Express package, a man dressed in shorts and a T-shirt with a police officer's badge around his neck "ran out of the door [of the laundry room in which he was hiding] yelling police, get down on the ground, get down on the ground." Obi's reaction was to "turn[] slightly [and] start[] to take a couple of steps down the hallway," whereupon the officer "jumped on his back." Obi "carried[the officer] for a couple more steps before some of the other officers got there." Before being subdued, Obi struggled with these officers for approximately 50 seconds, which they characterized as "a long period for a struggle" of this nature.

In light of this evidence, the district court instructed the jury that it had

> heard evidence that the defendant attempted to flee after he believed that he was about to be arrested for the crime for which he is now on trial. The defendant denies that he attempted to flee. If proved, the flight of a defendant after he knows he is to be accused of a crime may tend to prove that the defendant believed that he was guilty. It may be weighed by you in this connection, together with all other evidence.
>
> However, flight may not always reflect feelings of guilt[]. Moreover, feelings of guilt which are present in many innocent people do not necessarily reflect actual guilt. You are specifically cautioned that evidence of flight of a defendant may not be used by you as substitute for proof of guilt.

4

> Flight does not create a presumption of guilt. Whether or not evidence of flight does show that the defendant believed that he was guilty and the significance, if any, to be given to the defendant's feelings on this matter are for you to determine.

Obi challenges this jury instruction as unsupported by the evidence of his conduct at the time of his arrest.

It cannot be doubted that in appropriate circumstances, a consciousness of guilt may be deduced from evidence of flight and that a jury's finding of guilt may be supported by consciousness of guilt. As Professor Wigmore aptly observes, "The innocent man is without [consciousness of guilt]; the guilty man usually has it. Its evidential value has never been doubted." 1 A Wigmore on Evidence § 173 (Tillers rev. 1983).

But the jury's consideration of evidence of flight requires that it be able, from the evidence, to link such flight to consciousness of guilt of the crime for which the defendant is charged. This requires evidence supporting all the inferences in the causative chain between flight and guilt. See United States v. Beahm, 664 F.2d 414, 420 (4th Cir. 1981) (noting that the evidence of flight must be scrutinized to "ensure that each link in the chain of inferences leading to that conclusion [of the defendant's guilt] is sturdily supported"). To establish this causal chain, there must be evidence that the defendant fled or attempted to flee and that supports inferences that (1) the defendant's flight was the product of consciousness of guilt, and (2) his consciousness of guilt was in relation to the crime with which he was ultimately charged and on which the evidence is offered. See United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977) (articulating the chain of inferences in four deductive steps: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged"); United States v. Schepp, 746 F.2d 406, 409-10 (8th Cir. 1984) (same). In the absence of evidence to support any single link in the causative chain, it is error to give a flight instruction. See United States v. Hawkes, 753 F.2d 355, 358 (4th Cir. 1985) (reversing defendant's conviction because there was "no direct evidence to indicate that[the defendant] was at

5

the farm and subsequently fled to avoid capture and arrest by the police"); Beahm, 664 F.2d at 420 ("The government's failure to substantiate adequately the inference that defendant was aware he was wanted for the crime renders the instruction given the jury in this case irretrievably erroneous").

In this case, substantial evidence was presented to indicate that the package at Obi's ex-girlfriend's apartment contained contraband and that Obi intended to pick the package up at the time he was arrested. There is also evidence to indicate that at the time of his arrest, Obi was aware that the persons seeking to arrest him were police officers. The step in the causal chain wherein the adequacy of the evidence may be questioned most fruitfully is whether there was sufficient evidence of flight.

On being confronted by the police officers at the apartment, the evidence reveals only that Obi "turned slightly, started to take a couple steps down the hallway," and that after a policeman jumped on Obi's back, "he carried [the officer] for a couple more steps" before being brought down. Obi notes that this conduct could reasonably be interpreted as evidence that Obi was startled at having been pounced upon unexpectedly by a man dressed in street clothing who burst from a hiding place.

We agree with Obi that the evidence is thin and may be ambiguous. But even if we were to conclude that the district court erred in instructing the jury on flight, we are satisfied, beyond a reasonable doubt, that the error was harmless. See United States v. Hastings, 134 F.3d 235, 241 (4th Cir. 1998). In making such a determination, we "consider . . . what effect the . . . error had . . . upon the guilty verdict" by looking "to the basis on which `the jury actually rested its verdict.'" Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (quoting Yates v. Evatt, 500 U.S. 391, 404 (1991)).

In this case, we are satisfied, beyond a reasonable doubt, that the jury based its conspiracy conviction on the evidence linking Obi to the illegal parcel provided by the circumstances of his coming to the apartment and by the unrelated facts involving the four acts of heroin distribution that occurred several months later. Indeed, it is beyond all doubt that the jury did not consider any consciousness of guilt mani-

6

fested in May 1998 when it convicted Obi on four distribution counts relating to transactions that occurred months later. Obi could not have attempted to escape from police because of criminal behavior that had not yet occurred or, presumably, even been contemplated at the time the proposed flight occurred.

Accordingly, we find that if the giving of the flight instruction was erroneous, it was harmless. See Sullivan, 508 U.S. at 279 ("The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error").

III

Obi next contends that his indictment, charging him with distribution of a "detectible amount" of heroin, was fatally defective under United States v. Hooker, 841 F.2d 1225, 1232-33 (4th Cir. 1988) (en banc), because it failed to charge him with the offense for which he was sentenced -- distribution of 1-3 kilograms of heroin. He cites several cases for the proposition that a district court lacks jurisdiction to try a defendant when the underlying indictment fails to include an essential element of the offense, thus requiring that his subsequent conviction be vacated. See e.g., id. at 1232; see also United States v. Tran, 2000 WL 1701651 (2d Cir. Nov. 15, 2000). In support of the proposition that the drug amount used to sentence Obi is an essential element of the offense, Obi relies upon the Supreme Court's recent decision in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000). Based on his claim of defect, Obi asserts that he is entitled to have his convictions reversed.

If we were to assume for the sake of discussion that drug quantity is indeed an essential element of Obi's drug trafficking offense, the indictment in this case nevertheless charged Obi with that element, as well as every other element of the offense. The amount charged in the indictment -- a "detectable amount" of heroin -- fulfills the language of 21 U.S.C. § 841 prohibiting the distribution of "a controlled substance." Accordingly, Obi's indictment properly charged him with every element of a crime for which he was subsequently found guilty by a jury beyond a reasonable doubt. Obi's assignment of error there-

7

fore cannot relate to the indictment or jury finding of guilt on that indictment, but must relate to sentencing, during which the district court found that Obi was involved in the distribution of 1-3 kilograms of heroin by a preponderance of the evidence and relied on that amount in fixing the final sentence.

This argument, however, is foreclosed by our recent decision in United States v. Kinter, 235 F.3d 192, 201 (4th Cir. 2000), which instructs that factual determinations that increase a defendant's sentence under the sentencing guidelines do not implicate Apprendi and may be made by the sentencing judge as long as the sentence imposed is less than the maximum permitted by statute for the offense for which the defendant was convicted. Kinter emphasizes that Apprendi held specifically only that factual findings that "increase[] the penalty for a crime beyond the prescribed statutory maximum" must be found by a jury beyond a reasonable doubt. Id. at 199 (quoting Apprendi, 120 S. Ct. at 2362-63 (internal quotation marks omitted)).

In this case, Obi was convicted of distributing, or of having an intent to distribute, "a detectable amount of heroin, a . . . controlled substance," in violation of 21 U.S.C. § 841(a)(1). The sentence for this crime, when it involves an unspecified, detectable amount of a controlled substance, may not exceed 20 years' imprisonment. Similarly, a conviction under 21 U.S.C. § 846, which criminalizes conspiracy, tracks the underlying offense and may not be penalized for more than 20 years. While 21 U.S.C. § 841 indicates that penalties exceeding 20 years may be imposed if greater amounts of a controlled substance are involved, Obi's sentence was only 200 months.

In this case, therefore, pursuant to Kinter, Obi's sentence does not offend the standards set forth in Apprendi, despite the fact that his sentence is based, in part, on factual findings of drug quantity made by the sentencing judge by a preponderance of the evidence.

IV

Finally, Obi challenges two evidentiary rulings made during trial permitting the admission of (1) evidence that Obi had previously been incarcerated, and (2) hearsay testimony that linked Obi to known drug dealers. When an objection to the admission of evidence has been

8

made, we review the district court's evidentiary rulings for an abuse of discretion. See United States v. Queen, 132 F.3d 991, 993 (4th Cir. 1997).

Obi argues that the evidence of his incarceration during May and June of 1988, when he met Sallah, was so prejudicial that admitting it constituted an abuse of the district court's discretion under Federal Rule of Evidence 403. We reject this argument for the same reasons given by the district court, which pointed out that it is not tenable to claim that the probative value of highly material evidence -- that which linked Obi to his alleged co-conspirator Sallah -- was "substantially outweighed by the danger of unfair prejudice" to Obi. In fact, the likelihood of additional prejudice to the jury was slight. The jury learned only that Obi was incarcerated following his arrest for shipping heroin to his girlfriend's apartment -- an arrest about which they had already heard evidence that was not itself contested as having been improperly admitted. Moreover, Obi himself testified to meeting Sallah while incarcerated.

Obi also challenges the admission of hearsay testimony elicited from Detective Roberts to explain how he began investigating Sallah and Obi. Detective Roberts testified that he was introduced to Sallah by Adrian Eskridge, who was cooperating following a cocaine distribution arrest, and Sallah is reported to have stated he "knew some dude named Obi." Obi now contends that the evidence should not have been admitted because it prejudiced him unduly by connecting him in the mind of the jury to "known, incarcerated drug dealers." Our review of the record reveals that Obi did not preserve this objection for appeal. At most, he requested an instruction limiting the government's inquiry, which the government apparently followed to his satisfaction at trial.

But even if his objection had been preserved by his request for a limiting instruction and the government's compliance with his request, we have permitted the admission of hearsay testimony "offered for the limited purpose of explaining why a government investigation was undertaken." United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985).

Obi relies heavily upon United States v. Williams, 133 F.3d 1048, 1052 (7th Cir. 1998), in which the court found a "strong possibility

9

that the jury made improper use of the evidence introduced through [the FBI agent's] testimony, i.e., as concrete proof that Williams did indeed participate in the bank robbery." However, in that case, unlike here, there was "no corroboration offered as to the reliability or truthfulness of the informant's declaration. The identifications of Williams [were] weak at best, and it [was] obvious that the minimal evidence the government did have was bolstered by inadmissible hearsay and opinion testimony." Id. at 1053.

Here, in contrast, it cannot be said that the hearsay testimony was the de facto basis for Obi's convictions. The government introduced a substantial amount of evidence linking Obi and Sallah, including their meeting in the Montgomery County holding facility; Obi's admissions that he visited Sallah and vice versa; the many phone calls made between their phones over the course of the relevant time period; and the marked bills given to Sallah during the fourth drug deal and found on Obi's person at the time of his arrest.

Given that the hearsay testimony in this case was used for a purpose recognized as legitimate in this circuit and that there was strong evidence linking Obi to Sallah in this conspiracy, it was well within the discretion of the district court to have admitted the evidence.

Accordingly, we affirm Obi's conviction.

AFFIRMED

10