742 S.E.2d 42

The STATE, Respondent,

v.

Anthony MARTIN, Appellant.

Appellate Case No. 2011–192066.

No. 5125.

Court of Appeals of South Carolina.

Heard April 3, 2013.
Decided May 1, 2013.

Appellate Defender LaNelle Cantey DuRant, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Mark Reynolds Farthing, both of Columbia, for Respondent.

CURETON, A.J.

Anthony Martin appeals his convictions for armed robbery and conspiracy to commit armed robbery, arguing the trial court erred in denying his motion to suppress evidence of flight. We affirm.

## FACTS

On April 23, 2009, a masked gunman robbed the Bank of America in Aiken of $12,000. Several months later, Martin was arrested in Atlanta, Georgia. When a police officer stopped him, Martin gave a false name and date of birth. After confirming his identity with a photograph, the officer arrested him and charged him with giving false information to a law enforcement officer. Martin was later transferred to South Carolina, where he was indicted for armed robbery and conspiracy to commit armed robbery.

## I. Motion to Suppress

Immediately prior to trial, Martin moved to suppress evidence of his arrest for giving false information. First, he argued the evidence was of a previous conviction and would constitute improper character evidence under Rule 404 of the South Carolina Rules of Evidence. Second, he contended the false-information incident occurred nearly a year after the robbery, and he had no reason to believe the Georgia authorities were seeking him in connection with the South Carolina robbery. The trial court denied his motion but noted the Georgia authorities could not testify Martin was convicted of giving false information to law enforcement.

## II. Trial

At trial, the State presented evidence that Martin, Quinton Harmon, David Dixon, and Roosevelt Johnson had planned and executed the robbery. Harmon had scouted the bank, Dixon had acted as lookout, Martin had entered the bank and demanded money, and Johnson had driven the getaway car.

Eyewitnesses testified bank employees and two customers were present when a man wearing a dark hoodie and a mask that covered his face entered the bank. Witnesses could not identify the man, who ran into the lobby pointing a gun and ordered the employees and customers to get down on the floor. One employee pulled the silent alarm and dialed 911. Another employee, watching from the parking lot as the man ran out of the bank, provided police with a description and the license plate number of the getaway car.

Harmon, Johnson, and Dixon testified they knew Martin as "T–Money." All three men admitted robbing the bank. According to the men, Martin proposed a robbery the day before the incident, and they scouted possible targets the same evening. On the day of the robbery, Johnson picked up the other three men in his red 2005 Mustang. They stopped at a local fast-food restaurant, where Martin obtained a pair of gloves, then traveled to Dixon's home, where Dixon gave Martin a pillowcase and white t-shirt.

Later, the men drove to a car wash near the bank. Harmon went into the bank to "scope it out" and asked the teller questions about opening accounts. According to the men, after Harmon returned to the car and delivered his report, Martin pulled black pants and a black hooded jacket on over his other clothing and wrapped Dixon's white t-shirt around his face. He carried a black handgun.[1] Harmon, Dixon, and Johnson waited in the car while Martin robbed the bank. When he returned, Martin jumped into the car and told Johnson to drive.

As Johnson drove toward Augusta, Georgia, Martin stripped off the black clothing and handed $300 or $400 to each of the other men. Indicating he meant to board a bus for Atlanta, Martin directed Johnson to drive to the bus station in Augusta. However, Martin was unable to buy a ticket due to a power outage. The men drove to the local mall, where Martin called a friend to pick him up. The other three men left the mall in Johnson's car.

After the police published a photograph of Harmon taken from the bank's security camera shortly before the robbery,

---

1. Jacob McKie testified he loaned Martin a small, black pellet gun on the morning of the robbery.

Harmon contacted them. He gave a statement that led to his arrest and to the issuance of arrest warrants for Johnson, Dixon, and Martin. Later, Johnson named the same four men in his statement to the police.[2] Officers identified Martin's grandmother and obtained from her Martin's full name, date of birth, and physical description. An officer in Gwinnett County, Georgia, provided them with a photograph of a person Johnson and Harmon confirmed was the man they knew as T–Money.

Officer Christopher Poythress of the DeKalb County Police Department testified that on April 13, 2010, he was sent to locate a wanted person at an apartment complex in Atlanta, Georgia. His dispatcher provided the name Anthony Martin, a date of birth, and an address. Finding no one at home, Officer Poythress contacted the leasing office and confirmed Martin stayed at the apartment. As the officer was leaving the complex, he stopped a man fitting the description he received from the leasing agent. Officer Poythress recalled the man denied having any identification but gave the name Troy Brown and a birthdate of January 15, 1985. The man first claimed to live on the property but then stated he was there to visit his sister. Later, after receiving a color photograph of Martin, Officer Poythress confirmed Martin was the man he had stopped.[3]

In his defense, Martin presented testimony from his mother and grandmother. According to his grandmother, Martin lived with her in South Carolina until Easter Sunday, which was April 12, 2009, when his mother took him back home to Snellville, Georgia. His mother recalled waking him up in Snellville on the day of the robbery and dropping him off near a bus stop so he could look for work.

In its closing argument, the State summarized the testimony, noting Martin had given Officer Poythress "a fake name [and a] fake date of birth and tried to mislead him about what he was doing in that apartment complex." The State conclud-

---

2. The police spoke with Johnson first, but in that initial discussion, Johnson claimed to have been at the mall during the robbery.

3. It is important to note that Officer Poythress never testified Martin was arrested for giving false information or that he was convicted of that crime.

ed its argument by capitalizing on Martin's departure for Atlanta:

> The defense asked where did all of that money go? Well[,] that money went to Atlanta, because T–Money took the money and ran. He had his friend come pick him up and take him to Atlanta. When the police tried to approach him and tried to talk to him at that apartment complex. He lied about his name. He lied about his date of birth. He evaded law enforcement. He gave misleading information. So now you have the opportunity to play your part[,] and the [S]tate asks that you go back into that room and deliberate and find this defendant guilty.

The jury convicted Martin of both offenses. He received concurrent sentences of twenty years' imprisonment for armed robbery and five years' imprisonment for criminal conspiracy. This appeal followed.

## STANDARD OF REVIEW

■■■ In criminal cases, the appellate court sits to review errors of law only and is bound by the factual findings of the circuit court unless clearly erroneous. *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).

## LAW/ANALYSIS

Martin asserts the trial court erred in refusing to suppress evidence that he gave Officer Poythress false identifying information, because no nexus existed between the false information and the bank robbery. We agree, but we find the error was harmless.

■■■ "As a general rule, any guilty act, conduct, or statements on the part of the accused are admissible as some evidence of consciousness of guilt." *State v. McDowell*, 266 S.C. 508, 515, 224 S.E.2d 889, 892 (1976). This general rule applies to evidence of particular acts, including flight. *State v. Orozco*, 392 S.C. 212, 218, 708 S.E.2d 227, 230 (Ct.App.2011), *cert. granted* (Oct. 17, 2012). Our supreme court has identified the "critical factor to the admissibility of evidence of

flight" as "whether the totality of the evidence creates an inference that the defendant had knowledge that he was being sought by the authorities ... [and his] actions were motivated as a result of his belief that police officers were aware of his wrongdoing and were seeking him for that purpose." *State v. Pagan*, 369 S.C. 201, 209, 631 S.E.2d 262, 266 (2006). In addition, this court has held evidence of "unexplained" flight

> is admissible as indicating consciousness of guilt, for it is not to be supposed that one who is innocent and conscious of that fact would flee. However, we have further noted that [t]he critical factor to the admissibility of evidence of flight is whether the totality of the evidence creates an inference that the defendant had knowledge that he was being sought by the authorities. Flight evidence is relevant when there is a nexus between the flight and the offense charged. It is sufficient that circumstances justify an inference that the accused's actions were motivated as a result of his belief that police officers were aware of his wrongdoing and were seeking him for that purpose. Where the circumstances fail to show the necessary nexus between a defendant's flight and the current offense for which he is on trial, the flight evidence is not relevant and should not be admitted.

*Orozco*, 392 S.C. at 220, 708 S.E.2d at 231 (citations and internal quotation marks omitted). This court has also recognized that South Carolina's rule echoes the federal rule:

> [T]he relevance of flight evidence is premised on a nexus between the flight *and the offense charged. See, e.g., United States v. Beahm*, 664 F.2d 414, 419–20 (4th Cir.1981) (finding evidence of flight inadmissible where a defendant flees "after 'commencement of an investigation' unrelated to the crime charged, or of which the defendant was unaware"); *United States v. Foutz*, 540 F.2d 733, 740 (4th Cir.1976) (stating that evidence of flight should be excluded where defendant flees while being investigated for another crime).

*State v. Robinson*, 360 S.C. 187, 195, 600 S.E.2d 100, 104 (Ct.App.2004).

Decisions concerning the admission of flight evidence are subject to a harmless error analysis. *Pagan*, 369 S.C. at 212, 631 S.E.2d at 267. Generally, appellate courts do

not set aside a conviction based upon harmless error. *Id.* An error "is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained. Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *Id.* (citation and internal quotation marks omitted).

## I. Totality Test and Nexus Requirement

The State correctly distinguishes between evidence of flight, on the one hand, and the evidence challenged in this appeal, which concerned Martin's dishonest answers to Officer Poythress's questions. However, because flight is merely one form of evasive conduct, we find the totality test used to determine the admissibility of flight evidence is equally useful in determining the admissibility of evidence of other types of evasive conduct.

A court assessing evidence of flight must determine whether "the totality of the evidence creates an inference that the defendant had knowledge that he was being sought by the authorities." *Id.* at 209, 631 S.E.2d at 266. This test requires the existence of a nexus between the flight and the offense charged. *See, e.g., Robinson,* 360 S.C. at 195, 600 S.E.2d at 104 (recognizing the nexus requirement). An alternate explanation for the flight may affect the admissibility of the evidence. *See Orozco,* 392 S.C. at 220, 708 S.E.2d at 231 (noting evidence of "unexplained" flight "is admissible as indicating consciousness of guilt, for it is not to be supposed that one who is innocent and conscious of that fact would flee"). This totality test and its components assist the trial court in determining the relevance of evidence of evasive conduct, as well as in weighing the probative value of that evidence against its prejudicial effect. *See* Rule 401, SCRE (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . .").

 In the federal courts, "[t]he chain of inferences leading from evidence of flight to consciousness of guilt must lead to consciousness of guilt of the crime charged." *United States v. Porter*, 821 F.2d 968, 976 (4th Cir.1987). Moreover,

> To establish this causal chain, there must be evidence that the defendant fled or attempted to flee and that supports inferences that (1) the defendant's flight was the product of consciousness of guilt, and (2) his consciousness of guilt was in relation to the crime with which he was ultimately charged and on which the evidence is offered.

*United States v. Obi*, 239 F.3d 662, 665 (4th Cir.2001). An inference that guilty knowledge motivated the accused to flee "would be completely unfounded where a defendant fle[d] after commencement of an investigation unrelated to the crime charged, or of which the defendant was unaware." *Beahm*, 664 F.2d at 419–20 (internal quotation marks omitted). In *Beahm*, the trial court instructed the jury it could infer guilt from evidence of the accused's flight, which occurred three weeks after the crime but on the same day the accused received a note from an FBI agent requesting that the accused contact him. *Id.* at 416, 420. The appellate court found the instruction to be error because "[i]n essence, the jury was allowed to draw an inference of ultimate guilt from flight based upon an inference that defendant felt guilty after receiving a note from the FBI." *Id.* at 420. The appellate court held evidence must "sturdily support[ ]" each inference linking the accused's flight to the offense charged. *Id.* Nonetheless, it reversed based upon "[t]he government's failure to substantiate adequately the inference that [Beahm] was aware he was wanted for the crime." *Id.*

Although the general rule covers "any guilty act, conduct, or statements on the part of the accused," the body of law that has developed around this inference of a guilty conscience has primarily concerned flight. *McDowell*, 266 S.C. at 515, 224 S.E.2d at 892. The rationale underlying the admissibility of flight evidence, that "it is not to be supposed that one who is innocent and conscious of that fact would flee," applies to other forms of evasive conduct as well. *See Orozco*, 392 S.C. at 220, 708 S.E.2d at 231. The courts should not suppose a person who knew he was innocent but under suspicion would disguise himself, hide from the police, or lie to officers investi-

gating the crime of which he is suspected. Accordingly, we find the test for determining the admissibility of evidence concerning flight also applies to evidence of evasive conduct.

## II. Error

 Under the totality test, the State failed to establish a nexus between the robbery of the Bank of America in Aiken and Martin's deceitful answers. The robbery took place in South Carolina on April 23, 2009. Nearly a year later, Officer Poythress, an officer for DeKalb County, Georgia, approached Martin at an apartment complex in Atlanta and asked him about his identity and his business at the apartment complex. Although the officer was uniformed and drove a marked police car, he did not indicate his reason for stopping Martin. Thus, Martin's dishonesty to Officer Poythress was both temporally and geographically remote from the robbery. No evidence indicated the police had previously contacted Martin, he had received a warning about the investigation, or Martin had made statements to others about being sought for the robbery. As in *Beahm*, the State failed to present evidence Martin knew the police suspected him of the Bank of America robbery.

 Martin also argues that because he was on probation, he was entitled to an inference his evasive conduct was attributable to his efforts to avoid arrest for violating his probation. We note that, while the State asserted at the suppression hearing that Martin skipped town without telling his probation officer and "[d]id not transfer it back to Atlanta," Martin did not make that argument as the basis for suppressing evidence of his evasive conduct. Thus, he is not entitled to argue such an inference on appeal. *See State v. Haselden*, 353 S.C. 190, 196, 577 S.E.2d 445, 448 (2003) (holding an appellant may not argue one ground to the trial court and another ground on appeal). Notwithstanding, without an inference that Martin's guilty knowledge of the bank robbery led to his dishonesty with Officer Poythress, the State failed to establish a nexus between the 2009 bank robbery and Martin's 2010 lies to the police. Consequently, the trial court erred in admitting evidence of Martin's attempt to avoid arrest.

### III. Prejudice

Nonetheless, we find the trial court's admission of the challenged evidence was harmless. While it is true the eye-witnesses in the bank could not identify the gunman and no forensic evidence linked Martin to the robbery, the State presented ample competent evidence of Martin's guilt. *See Pagan,* 369 S.C. at 212, 631 S.E.2d at 267 (stating "an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached"). Harmon, Johnson, and Dixon testified consistently that Martin had served as the mastermind and the gunman in the robbery for which each of them faced a charge of bank robbery and a possible prison sentence of thirty years. Eyewitness descriptions of the gunman's attire and pillowcase-style money bag comported with the co-conspirators' descriptions of the clothing and bag Martin carried on the day of the robbery. Furthermore, Jacob McKie, a disinterested party, recalled loaning Martin a small, black pellet gun the night before the robbery. In view of this evidence, Officer Poythress's testimony likely had no effect on the jury's determination of guilt. Therefore, any error the trial court committed in admitting the challenged evidence was harmless.

### CONCLUSION

We find the test previously articulated for determining the admissibility of evidence of flight applies to evidence of other forms of evasive conduct. In applying this test to the evidence against Martin, we find the State failed to establish a nexus between the April 2009 robbery of the Bank of America in Aiken and Martin's provision of false identifying information to a Georgia police officer the following year. As a result, insufficient evidence was presented to support an inference Martin lied to the officer to avoid prosecution for the Bank of America robbery. However, in view of the evidence presented of Martin's guilt, we find any error in admitting this evidence was harmless beyond a reasonable doubt. Accordingly, the decision of the trial court is

**AFFIRMED.**

WILLIAMS and KONDUROS, JJ., concur.