# The Supreme Court of South Carolina

The State, Respondent,

v.

Stewart Jerome Middleton, Petitioner.

Appellate Case No. 2020-001665

---

ORDER

---

After careful consideration of the petition for rehearing, the Court is unable to discover that any material fact or principle of law has been either overlooked or disregarded, and hence, there is no basis for granting a rehearing. Accordingly, the petition for rehearing is denied. However, we withdraw the original opinion and substitute the attached opinion changing the original opinion only in section III, Harmless Error Analysis.

s/ John W. Kittredge      A.C.J.

s/ John Cannon Few      J.

s/ George C. James, Jr.      J.

s/ James E. Lockemy      A.J.

s/ Kaye G. Hearn      A.J.

Columbia, South Carolina
September 20, 2023

# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Stewart Jerome Middleton, Petitioner.

Appellate Case No. 2020-001665

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
J. C. Nicholson Jr., Circuit Court Judge

---

Opinion No. 28142
Heard May 19, 2022 – Filed March 22, 2023

Re-Filed September 20, 2023

---

## REVERSED AND REMANDED

---

Chief Appellate Defender Robert Michael Dudek, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson and Senior Assistant Deputy Attorney General William M. Blitch Jr., of Columbia; Solicitor Scarlett Anne Wilson, of Charleston, all for Respondent.

---

**JUSTICE FEW:** At Stewart Jerome Middleton's trial for criminal sexual conduct in the third degree, the State introduced a police detective's testimony that Middleton was evasive in response to her attempts to get Middleton to come in for an interview. The trial court admitted this testimony over Middleton's relevance objection. The jury found Middleton guilty and the court of appeals affirmed. We hold the trial court erred in finding the testimony relevant because the State did not establish a nexus between Middleton's conduct and a consciousness of his guilt. We reverse and remand for a new trial.

## I.      Background

On December 14, 2013, the victim hosted an office party at the Embassy Suites hotel in North Charleston. Around 7:30 p.m., the victim asked a friend to help her back to her hotel room because she was too intoxicated to stay at the party. Middleton— the victim's coworker—arrived at the party around 9:00 p.m. At 10:20 p.m., the friend and his wife went to check on the victim and noticed Middleton was following them. When the friend opened the victim's hotel room using a key card the victim had given him earlier, the victim jumped out of bed, naked. The friend, his wife, and Middleton all left the room and got back onto the elevator. As the elevator doors closed, according to the friend's testimony at trial, Middleton "jumped out" of the elevator and the friend did not see him again. In the interview Middleton eventually had with the detective, he claimed he saw the victim locked out of her room covered in a towel and he left the elevator to help her. The friend testified he did not hear or see the victim in the hallway and, as far as he knew, the victim was safe in her room.

Middleton then went to the front desk and asked for a key card for the victim's room, telling the guest services manager, "I came to get a key for my girlfriend who's stuck out of her room." The victim was not Middleton's girlfriend. At about 10:25 p.m., Middleton claimed in the interview with the detective, he let the victim into her room and went in with her. Middleton stated they started kissing and eventually had consensual sexual intercourse. The victim testified at trial she did not consent to intercourse with Middleton and was incapable of consenting because she was so intoxicated. Around 11:15 p.m., the guest services manager found the victim crouched in an employee-only area of the hotel. The victim told the manager she had been raped. The manager called the police, who were dispatched at 11:38 p.m., and then paramedics took the victim to the hospital.

During trial, the State asked the detective, "How many times did you schedule an interview with him?," referring to Middleton. As the detective began her response,

"I think the first --," Middleton objected on relevance grounds.  The trial court overruled the objection without discussion.  The detective continued,

> First time I made contact with the defendant, I want to say it was February 3rd.  Don't quote me, around there, the 3rd, 4th.  I know it took about 17 to 20 days for him to come in.  He didn't show for the first two.  He would call after the fact, or, like 24 hours later.  Then -- because we were having such a difficult time getting him to actually stick to an appointment and come in, I told him, Go home.  Look at your schedule.  Find a day that suits you and your place of employment, and then call me and you tell me what day you want to come in, and I'll accommodate -- whatever day, whatever time, I'll accommodate you.

> So he left city hall, and he never called me back.  So I had to reach out to him again.  It was 12 or 13 days after not hearing from him, and then we finally met on February 20th.

On cross-examination, defense counsel attempted to mitigate the effect of the detective's testimony by asking if she experienced delays in interviewing other witnesses in the case.  After the detective conceded she "played some phone tag" with one other witness, counsel stated, "Right, and so – it goes back to when you were trying to get people in," and asked, "Sometimes they're not able to do that immediately, are they?"  The detective responded, "Your client is the only one who was ducking and dodging me."  Middleton did not object to this comment.

The jury convicted Middleton of criminal sexual conduct in the third degree, and the trial court sentenced him to six years in prison, suspended upon service of six months in prison and five years of probation.  Middleton appealed, and the court of appeals affirmed. *State v. Middleton*, Op. No. 2020-UP-271 (S.C. Ct. App. filed Sept. 30, 2020).  We granted Middleton's petition for a writ of certiorari to address whether the trial court acted within its discretion in admitting the detective's testimony about Middleton's attempts to avoid coming in to see her for an interview.

## II. Admissibility of the Testimony

We begin with the central premise of the law of evidence: "All relevant evidence is admissible . . . ," and, "Evidence which is not relevant is not admissible." Rule 402, SCRE. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. The State argues the detective's testimony was relevant because it showed "the process and direction of the investigation" and "the avoidance indicated a consciousness of guilt." We begin with the latter point.

### A. Consciousness of Guilt

In *State v. McDowell*, 266 S.C. 508, 224 S.E.2d 889 (1976), this Court stated, "As a general rule, any guilty act, conduct, or statements on the part of the accused are admissible as some evidence of consciousness of guilt." 266 S.C. at 515, 224 S.E.2d at 892. In subsequent decisions, this Court and our court of appeals have clarified that for such an act by a defendant to be relevant as "consciousness of guilt" under Rule 401, "there [must be] a nexus between the [conduct] and the offense charged." *State v. Pagan*, 369 S.C. 201, 209, 631 S.E.2d 262, 266 (2006) (citing *State v. Robinson*, 360 S.C. 187, 195, 600 S.E.2d 100, 104 (Ct. App. 2004)). In *State v. Cartwright*, 425 S.C. 81, 819 S.E.2d 756 (2018), we held there must be "an unmistakable nexus . . . by clear and convincing evidence linking the [conduct] to a guilty conscience derivative of the offense for which the defendant is on trial." 425 S.C. at 92, 819 S.E.2d at 762; *see also State v. Martin*, 403 S.C. 19, 28, 742 S.E.2d 42, 47 (Ct. App. 2013) (requiring "a nexus between the [conduct] and the offense charged").

In *Pagan*, the conduct at issue was what we called "flight," 369 S.C. at 208-09, 631 S.E.2d at 265-66, and in *Cartwright*, the conduct was a suicide attempt, 425 S.C. at 90, 819 S.E.2d at 760. Our reasoning in those cases transcends their specific facts, however, and applies to any case in which the State contends the defendant's guilty act or evasive conduct is relevant because it shows a consciousness of guilt. *See Martin*, 403 S.C. at 28, 742 S.E.2d at 46 (stating "because flight is merely one form of evasive conduct, we find the . . . test used to determine the admissibility of flight evidence is equally useful in determining the admissibility of evidence of other types of evasive conduct"). Referring to our decision in *McDowell*, the *Martin* court explained,

> The rationale underlying the admissibility of flight evidence, that "it is not to be supposed that one who is innocent and conscious of that fact would flee," applies to other forms of evasive conduct as well. The courts should not suppose a person who knew he was innocent but under suspicion would disguise himself, hide from the police, or lie to officers investigating the crime of which he is suspected. Accordingly, we find the test for determining the admissibility of evidence concerning flight also applies to evidence of evasive conduct.

403 S.C. at 29-30, 742 S.E.2d at 47 (internal citation omitted) (quoting *State v. Orozco*, 392 S.C. 212, 220, 708 S.E.2d 227, 231 (Ct. App. 2011), *overruled on other grounds by State v. Stukes*, 416 S.C. 493, 500 n.5, 787 S.E.2d 480, 483 n.5 (2016), *and abrogated by Cartwright*, 425 S.C. at 91, 819 S.E.2d at 761).

In this case, therefore, we must consider whether the State established a nexus between Middleton's conduct and his charge for criminal sexual conduct in the third degree such that the conduct had "any tendency" to make Middleton's consciousness of guilt "more probable . . . than it would be without the evidence." Rule 401, SCRE. As our court of appeals stated in *Martin*, we consider the "chain of inferences leading from evidence of [the defendant's conduct]" to determine whether the inferences logically "lead to consciousness of guilt of the crime charged." 403 S.C. at 29, 742 S.E.2d at 47 (quoting *United States v. Porter*, 821 F.2d 968, 976 (4th Cir. 1987)). We begin this inquiry by looking at the typical scenario in which courts have found a defendant's conduct does in fact demonstrate a consciousness of guilt—flight. For this typical scenario, we turn to *Porter*, a case relied on by our court of appeals in *Martin*. In *Porter*, a federal Drug Enforcement Administration agent

> testified . . . he was executing a search warrant at Porter's residence in Charlotte, North Carolina, when Porter called from Tennessee and the agent answered the phone. He told Porter that a federal grand jury in Florida had indicted him for importation and possession and that he had a warrant for Porter's arrest. After the agent advised him to turn himself in, Porter hung up. Porter remained a fugitive until . . . more than a year later.

821 F.2d at 975.

The Fourth Circuit found the evidence of flight reasonably demonstrated Porter's consciousness of guilt and was therefore properly admitted. 821 F.2d at 976. The court stated, "The jury reasonably could find that he became a fugitive to escape any prosecution for his numerous violations of the drug laws . . . ." *Id.* Our court of appeals addressed this typical scenario in *Robinson*, stating, "Flight from prosecution is admissible as evidence of guilt." 360 S.C. at 194, 600 S.E.2d at 104 (quoting *State v. Pagan*, 357 S.C. 132, 140, 591 S.E.2d 646, 650 (Ct. App. 2004), *aff'd as modified*, 369 S.C. 201, 631 S.E.2d 262) (collecting South Carolina "flight" cases). The *Robinson* court went on to caution, however, "the relevance of flight evidence is premised on a nexus between the flight *and the offense charged*." 360 S.C. at 195, 600 S.E.2d at 104.

When we compare Middleton's conduct in this case with the typical scenario of evasive conduct—flight—three differences stand out. First, in *Porter*, *Robinson*, and the cases cited in *Robinson*, the fleeing suspect/defendant was aware of an existing arrest warrant or indictment for his crimes. At the time the detective in this case sought an interview with Middleton, however, he had not been indicted and there was no warrant for his arrest. Rather, Middleton was free to refuse to meet with the detective altogether if he so chose.

Second, in every other case in which our courts have considered evidence of consciousness of guilt, the defendant's guilty act or evasive conduct was primarily some form of action. *See Cartwright*, 425 S.C. at 91, 819 S.E.2d at 761 (attempting suicide); *State v. Edwards*, 383 S.C. 66, 68, 678 S.E.2d 405, 406 (2009) (threatening a victim); *Martin*, 403 S.C. at 25, 742 S.E.2d at 45 (lying to the police to conceal his identity); *State v. Crawford*, 362 S.C. 627, 636, 608 S.E.2d 886, 891 (Ct. App. 2005) (fleeing the scene of arrest); *State v. Walker*, 366 S.C. 643, 655, 623 S.E.2d 122, 128 (Ct. App. 2005) (fleeing residence after investigator requested defendant "stay at or nearby his home"); *Robinson*, 360 S.C. at 190, 600 S.E.2d at 101 (fleeing from a patrol car). In this case, Middleton's failure to show up for voluntary interview appointments and his delay in giving a statement to the detective were primarily inaction.

The State nevertheless argues Middleton's conduct was active: Middleton intentionally scheduled two appointments with the detective knowing he would not show up, all as an effort to hinder the investigation of his criminal activity. Here, we are drawn back to the point we noted earlier that the trial court overruled Middleton's objection "without discussion." This theory that Middleton's conduct was active—had it been presented to the trial court—could have made a valid nexus, but it must have been based on evidence and should have been subjected to the trial

court's exercise of discretion. With no discussion of this potential nexus at trial, there is no basis to support the State's theory, just as there is nothing to support or refute other "innocent" reasons Middleton may have had for missing the appointments. *Cf. Commonwealth v. Molina*, 104 A.3d 430, 451 (Pa. 2014) ("[A] defendant's silence in the face of police questioning is 'insolubly ambiguous' as it could be indicative of a busy schedule, a distrust of authority, an unwillingness to snitch, as much as it is indicative of guilt.").

Third, as our cases require, we must consider precisely how a particular piece of evidence might show a defendant's consciousness of guilt. We look to see whether the "chain of inferences leading from [the] evidence," *Martin*, 403 S.C. at 29, 742 S.E.2d at 47, shows "a guilty conscience derivative," *Cartwright*, 425 S.C. at 92, 819 S.E.2d at 762, of "the offense charged," *Robinson*, 360 S.C. at 195, 600 S.E.2d at 104 (emphasis removed). At the time of Middleton's interview—and presumably beforehand as well—he did not contest he was with the victim and had intercourse with her on the night of December 14. We can hypothesize several reasons Middleton may have wanted to avoid discussing with the detective—or anyone— even the innocent version of what happened the night of December 14. Perhaps he wanted to keep his wife or a girlfriend from knowing about it, or he may simply have been embarrassed that he had even consensual sex with a coworker. Middleton's "guilt" depended not on whether he had sex with the victim, but on whether she remained too intoxicated to consent to having sex at 10:25 p.m. and, if so, whether Middleton knew or should have known that. *See* S.C. Code Ann. § 16-3-654(1)(b) (2015) ("A person is guilty of criminal sexual conduct in the third degree if the actor engages in sexual battery with the victim and if . . . [he] knows or has reason to know that the victim is . . . mentally incapacitated[] or physically helpless . . . ."). It is difficult to discern a nexus between Middleton's inaction in this case and a consciousness that the victim was too drunk to consent to sex weeks earlier.

Considering these three points, we see a significant difference between a suspect/defendant actively fleeing from authorities with knowledge of an arrest warrant or indictment for what was clearly a crime—*Porter*, for example—and this case. Here, Middleton did not flee, but avoided coming in for a voluntary interview about a situation for which no arrest warrant or indictment existed and which— according to his version of events—may not have even been a crime.

We have explained that to demonstrate the relevance of any type of evasive conduct or guilty act, the State must show a nexus between the conduct and the defendant's consciousness he is guilty of the specific crime. *See Martin*, 403 S.C. at 28-30, 742 S.E.2d at 46-47. For some types of such conduct, however, it is simply very difficult

for the State to make the required showing. *See Cartwright*, 425 S.C. at 97, 819 S.E.2d at 764 (Hearn, J., concurring) ("I do not, for example, find evidence of a suicide attempt similar to evidence of flight or witness intimidation or other incriminating behavior following the commission of a crime."). Middleton argued in his brief that from merely the fact he avoided the detective under the circumstances of this case, "it was unclear just what [he] morally or legally may have been guilty of doing." We agree. As the *Cartwright* majority found regarding evidence of attempted suicide, we find missing voluntary appointments to speak to the police under these circumstances "is not easily analogized to evidence of guilt." 425 S.C. at 91, 819 S.E.2d at 761.[1]

Therefore, the detective's testimony Middleton missed two scheduled appointments with her, she had "such a difficult time getting him to actually stick to an appointment and come in," and he delayed seventeen to twenty days before meeting with her for an interview was not relevant to show a consciousness of guilt.

### B.      Process and Direction of the Investigation

The State also argues the evidence was relevant to explain "the process and direction of the investigation." It is widely recognized there can be a legitimate purpose for explaining events that occurred or did not occur in the course of an investigation. *See, e.g.*, *State v. Brown*, 317 S.C. 55, 63, 451 S.E.2d 888, 894 (1994) (explaining statements were not hearsay because they were offered "to explain why the officers began their surveillance"). When it is important to do this, the evidence will be relevant. In many cases, however, it is not at all important to explain the course of the investigation. *See, e.g.*, *State v. King*, 422 S.C. 47, 66-68, 810 S.E.2d 18, 28-29 (2017) (explaining that the course of the investigation is not always "relevant and

---

[1] In *Cartwright*, because of the unique difficulties associated with evidence of suicide, we imposed specific requirements for the admission of the evidence such as "a hearing outside of the presence of the jury" in which the State must show "the defendant was aware of the occurrence of the alleged crimes" and the trial court must find "a clear and unmistakable nexus linking the suicide attempt to a guilty conscience derivative of the offense" demonstrated "by clear and convincing evidence." 425 S.C. at 91-92, 819 S.E.2d at 761-62. While we believe a hearing on the admissibility of evidence of evasive conduct will usually be necessary, and the trial court must find evidence to support the defendant's knowledge of the allegations against him, we do not find it necessary here to impose a higher standard of proof as we did in *Cartwright*.

probative" (citing *Ruiz v. Commonwealth*, 471 S.W.3d 675, 681 (Ky. 2015))). We understand the potential importance of explaining to the jury why the detective assigned to investigate a rape allegedly occurring on December 14 did not contact the only suspect until February 3 and did not conduct an interview with him until February 20. Such an explanation would logically begin, however, not with what did not happen and why between February 3 and 20, but with why the detective did not contact Middleton until February 3, over seven weeks after the crime was reported. As the detective was not asked to explain this much-larger portion of the delay—and made little effort on her own to explain it—we discount the importance of explaining how any portion of the delay in the investigation was supposedly attributable to Middleton.

The State's argument the testimony was relevant to explain the process and direction of the investigation takes us back to the detective's "ducking and dodging" comment. We have not previously discussed this comment as being inadmissible because—as noted above—Middleton did not object. We do find the comment important, however, in understanding whether the assistant solicitor genuinely sought, and the detective genuinely offered, an explanation of the process and direction of the investigation. First, the comment was not actually evidence of Middleton's conduct. Rather, the detective used the terms "ducking and dodging" in a figurative sense to characterize Middleton's actual conduct as evasive—a clearly improper and inadmissible characterization.[2] Second, the comment demonstrates the detective was not attempting to explain the process and direction of the investigation. At oral argument before this Court, counsel for Middleton argued, "She blew us up. She meant to hurt us, and she accomplished her mission." We agree. Rather than showing an attempt to explain the investigation, we are convinced the detective's only intent in giving even the testimony to which Middleton did object was to show Middleton had engaged in evasive conduct. As we explained thoroughly, this type of evidence is admissible only after the State has demonstrated the necessary nexus.

As the State failed to demonstrate the relevance of the detective's testimony, the trial court acted outside of its discretion in overruling Middleton's relevance objection.

## III.    Harmless Error Analysis

---

[2] In addition to the fact the State established no nexus between the conduct and a consciousness of guilt, the detective's characterization of Middleton's conduct as "ducking and dodging" was unsubstantiated guesswork disguised as the detective's opinion as to Middleton's intent.

The State argues that even if the testimony should not have been admitted, the error was harmless. The State first argues the error is harmless because other overwhelming evidence of guilt made this error harmless beyond a reasonable doubt. *See State v. Reyes*, 432 S.C. 394, 406, 853 S.E.2d 334, 340 (2020) (explaining that error may be found harmless when "the 'defendant's guilt has been conclusively proven . . . such that no other rational conclusion can be reached,'" or when there is other "'overwhelming evidence' of a defendant's guilt" (omission in original) (first quoting *State v. Collins*, 409 S.C. 524, 538, 763 S.E.2d 22, 29-30 (2014), then citing *State v. Kromah*, 401 S.C. 340, 361-62, 737 S.E.2d 490, 501 (2013))). We disagree. The State also argues the evidence had no prejudicial effect on Middleton because it "was cumulative to more damaging testimony elicited by [Middleton] on cross-examination." The State's argument is that the detective's "ducking and dodging" comment during cross-examination was "more damaging" than the testimony she gave on direct examination. While it is certainly true the "ducking and dodging" comment was very damaging, it does not render the trial court's error harmless. As we explained, the "ducking and dodging" comment was not evidence of Middleton's conduct. There is no contention Middleton was literally "ducking" or "dodging" the detective. Rather, the comment was a clearly improper and inadmissible characterization of the fact Middleton did not keep two appointments for an interview. Thus, the comment cannot be "cumulative" in the sense it rendered the direct testimony not prejudicial. Rather, it made the prejudicial testimony from direct more impactful by spinning Middleton's actual conduct as evasive when it was not necessarily so. We reject the State's harmless error argument.

## IV. Issue Preservation

The State makes a strong argument none of this is preserved for our review. The State's argument is essentially that the question, "How many times did you schedule an interview with him?" calls only for a harmless, numerical answer, and defense counsel never objected to the testimony the detective gave later concerning the details of Middleton's conduct. The State argues Middleton never made clear to the trial court the reason he claimed the testimony was not relevant—that it was evidence of consciousness of guilt.

We find the issue is preserved. In the simplest terms, Middleton made a timely objection on the grounds of relevance, the evidence was not relevant, and the trial court overruled the objection. *See State v. Jones*, 435 S.C. 138, 144, 866 S.E.2d 558, 561 (2021) (an issue is preserved for appellate review when a timely objection is ruled upon by the trial court). Even at the initial objection, the trial court should

have realized this testimony was not relevant. First, if the "how many times" question sought a harmless, numerical answer, the detective's start to her answer was a clear indication that was not the answer she planned to provide.

Second, the "how many times" question clearly sought information regarding events that occurred long after the alleged crime was over. As we explained, this post-event conduct could have been relevant to establish a consciousness of guilt or it could have been relevant to the course of the investigation. However, our courts have cautioned against a trial court's casual acceptance of either basis for relevance. *See Pagan*, 369 S.C. at 209, 631 S.E.2d at 266 (requiring a "nexus" for evidence of "flight"); *Martin*, 403 S.C. at 28, 742 S.E.2d at 46 (stating "because flight is merely one form of evasive conduct, we find the . . . test used to determine the admissibility of flight evidence is equally useful in determining the admissibility of evidence of other types of evasive conduct"); *King*, 422 S.C. at 67-68, 810 S.E.2d at 29 (cautioning trial courts to not immediately accept the probative value of "investigative information"). The State offered no other basis on which even the numerical answer the solicitor's first question called for could be relevant. While we are careful to acknowledge that any party is entitled to elicit general background information regarding the testimony of any witness, this is not general background information. Because the "how many times" question did not relate to the alleged crime itself, and no other basis exists for the relevance of the information the question would elicit, the trial court should have sustained the objection.[3]

## V. Conclusion

We find the detective's testimony that Middleton missed two scheduled appointments for an interview, she had "such a difficult time getting him to actually stick to an appointment and come in," and he delayed seventeen to twenty days before meeting with her was not relevant. The trial court should have sustained Middleton's relevance objection. We reverse and remand for a new trial.

---

[3] Optimally, when the detective began to provide details of Middleton's conduct beyond a numerical answer to the "how many times" question, two things should have happened. First, trial counsel should have asked for an opportunity to explain the objection. Under other circumstances, trial counsel's failure to more clearly explain the objection may render the issue not preserved. Second, the trial court should have realized it erroneously overruled the initial relevance objection and initiated a hearing outside the jury's presence. Nevertheless, under the circumstances of this case, we find the issue is preserved.

**REVERSED AND REMANDED.**

**KITTREDGE, Acting Chief Justice, JAMES, J., and Acting Justices James E. Lockemy and Kaye G. Hearn, concur.**