CHIEF JUSTICE BEATTY :
*758 **85 Harold Cartwright, III (Cartwright) was convicted of one count of first-degree criminal sexual conduct (CSC), eight counts of first-degree CSC with a minor, two counts of second-degree CSC with a minor, one count of third-degree CSC, and sixteen counts of committing a lewd act on a minor. Cartwright appealed, arguing the trial court abused its discretion in: (1) ruling evidence of his suicide attempt was admissible to show consciousness of guilt; and (2) qualifying a witness and allowing her to testify as an expert in the field of "child sexual abuse dynamics." The Court of Appeals affirmed. State v. Cartwright , Op. No. 2015-UP-466, 2015 WL 5723498 (S.C. Ct. App. filed Sept. 30, 2015). This Court granted Cartwright's petition for a writ of certiorari. We affirm.
I. Factual / Procedural History
Cartwright married Melinda Lively (Lively) in 1987. From that relationship, the couple had three children, Daughter, Hoss Cartwright (Hoss), and Jamie Cartwright. After Cartwright's divorce from Lively in 1997, Cartwright married Buffy Brown (Buffy) in 1999. Prior to marrying Cartwright, Buffy had two children, Stepdaughter One and Stepdaughter Two. In 2011, an Aiken County grand jury indicted Cartwright for sexually abusing Daughter and Stepdaughters One and Two between 1989 and 2011.
**86 At the time of trial, Daughter was twenty-eight years old. Daughter recalled that, in 1989 when she was four, Cartwright had her perform oral sex on him. Daughter testified further that, when she was five years old, she told Lively about the abuse, but Lively refrained from contacting the police because Cartwright threatened to kill Daughter, Lively, and himself. Lively recalled Daughter mentioning the abuse, and corroborated Daughter's recollection that Lively did not contact law enforcement because she was also afraid of Cartwright. Additionally, Daughter explained to the jury that, when she was six, Cartwright ejaculated in her mouth. Daughter stated she spoke with the South Carolina Department of Social Services (DSS) about the incident, but she recanted because Cartwright instructed her to tell DSS that the abuse never happened. Daughter maintained that Cartwright never had sexual intercourse with her, but the sexual abuse continued every year until 1995, when she was ten. Furthermore, in response to the State's question about bribes, Daughter testified Cartwright would give her money, take her places, and buy her various items.
In 2011, detectives from the Aiken County Sheriff's Department contacted Daughter as part of an ongoing investigation of the alleged abuse of Stepdaughters One and Two. At that time, Daughter gave a statement to investigators detailing the abuse, which she later recounted at trial. Additionally, on cross-examination, Daughter acknowledged that, from 1995 until 2011, she never mentioned the alleged sexual abuse because she was afraid of Cartwright.[1]
Stepdaughter One was twenty-one at the time of Cartwright's trial. She recalled that Cartwright began abusing her when she was nine. Thereafter, during the years of 2000 and 2001, Cartwright made Stepdaughter One perform oral sex on him multiple times a month. In July of 2001, Stepdaughter One disclosed the abuse to Sandra Parsons, a neighbor, and Michelle Prince, an Aiken *759 County DSS employee. As a result, Cartwright was arrested in September of 2001 and released on **87 bond. However, Stepdaughter One's mother, Buffy, convinced her to tell the prosecutors the abuse did not happen. Stepdaughter One explained that, after she recanted, Cartwright returned to the home and the abuse continued in the form of "humping."
Stepdaughter One further testified that, in 2002 when she was eleven, Cartwright began going into her room, rubbing his penis on her leg, and ejaculating on and in between her legs, "three to seven times a week." The abuse continued until 2006 when Stepdaughter One was fifteen. During this time, Cartwright threatened her with a knife and she eventually agreed to have sexual intercourse with him in exchange for money so she could visit an amusement park. Stepdaughter One maintained Cartwright would bribe her in the form of clothes, food, and transportation. According to Stepdaughter One, Cartwright threatened to kill her, Buffy, Stepdaughter Two, and himself.
Stepdaughter Two was eighteen at the time of Cartwright's trial. She alleged that Cartwright began sexually abusing her in 2008, when she was thirteen. She stated he would come into her room before school multiple times a week and hump her leg. Stepdaughter Two explained he would ejaculate on her, on her bed, and on her clothes. According to Stepdaughter Two, Cartwright threatened "to kill all of us and himself."
Stepdaughter Two testified that, when she was fourteen, Cartwright began having non-consensual sex with her. She recounted that, in May of 2010, after Hoss moved in, Cartwright stopped having sex with her, but continued to hump her before school. Hoss recalled that every morning he would hear Cartwright enter Stepdaughter Two's bedroom and stay for an extended period of time.
Investigators questioned Stepdaughter Two about the alleged sexual abuse. She initially told them Cartwright had not touched her because she was afraid of him but, after further questioning, she told the investigators Cartwright molested her.
Buffy testified that Cartwright would spend ten to twenty minutes waking up Stepdaughter One each morning before school. Buffy admitted that she put "some pressure" on Stepdaughter One to recant when Stepdaughter One originally **88 reported the abuse because Cartwright convinced Buffy that he had done nothing wrong.
Buffy acknowledged that on February 19, 2011, Cartwright revealed to her that he may have molested both stepdaughters. Thereafter, Buffy explained Cartwright instructed her to wash Stepdaughter Two's bed linens and underwear because he had been laying in the bed with Stepdaughter Two and his DNA was in the bed. However, Buffy declined to wash the linens and consented to police searching the house and seizing the linens on February 25, 2011. The DNA recovered from Stepdaughter Two's bed sheet was a 1 in 16 trillion match to Cartwright's DNA.
As part of its case, the State called Dr. Alicia Benedetto, a clinical psychologist, as an expert in "child sexual abuse dynamics." Over defense counsel's objection, the trial court qualified Dr. Benedetto as an expert in clinical psychology. Dr. Benedetto acknowledged that she had not talked to any witnesses or victims in the case. She explained that "Child Sexual Abuse Accommodation Syndrome" involved patterns of behavior that children engage in that may not make sense to adults. She stated that children often respond to sexual abuse in a different manner than adults. She acknowledged that a child's response, although different from an adult's, is not necessarily indicative of abuse or untruthfulness. She explained that, to maintain the secrecy of the abuse, it was common for an abuser to bribe or buy gifts for the abused children. Dr. Benedetto asserted that manipulation and fear also play roles in maintaining secrecy. Specifically, she testified "[children] may be afraid for their own safety or the safety of siblings or the safety of the other parent in the home." Additionally, she noted that sexual abuse may cause children to "act out" and abuse alcohol or drugs.
When asked about recantations, Dr. Benedetto maintained that "children routinely delay reporting" and any delay was not indicative *760 of whether or not sexual abuse occurred. Dr. Benedetto added "[c]ertainly we're open to the possibility that it is a true recantation, but we also know that many times a child recants because of what happens after they tell. And, so, we want to be sure not to miss those cases." **89 At the conclusion of the State's case, James Hettich, an Aiken County Detention Center guard, was offered to establish that Cartwright attempted to commit suicide while detained prior to trial. On April 13, 2011, Hettich found Cartwright hanging from his bunk with a sheet wrapped tightly around his neck. Hettich recalled that Cartwright was unresponsive, but still breathing.
Cartwright took the stand in his own defense. He denied molesting any of the children and claimed that the semen found on Stepdaughter Two's sheets came from Buffy pushing him onto Stepdaughter Two's bed and masturbating him with underwear.
Cartwright offered the following explanation as to why he attempted suicide:
I turned myself in. I'd been there for 30 days. I couldn't get a bond. I was charged with some of the most heinous crimes that somebody could ever think about being charged with.... I'm in my cell with all these things on my mind, and then the daughter that I loved, [Daughter], hates me so much because I had her husband ... locked up ... and she held a grudge against me, and they come [sic] and served me ten warrants.... [A]t that time I didn't feel I wanted to live any more [sic].
Ultimately, the jury found Cartwright guilty of all charges. The trial court sentenced him to concurrent terms of thirty years' imprisonment for first-degree CSC and each first-degree CSC with a minor, twenty years' imprisonment for each second-degree CSC with a minor, fifteen years' imprisonment for each lewd act on a minor, and a consecutive term of ten years' imprisonment for third-degree CSC. The Court of Appeals affirmed.
II. Standard of Review
"The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice." State v. Douglas , 369 S.C. 424, 429, 632 S.E.2d 845, 847-48 (2006). "An abuse of discretion occurs when the conclusions of the trial **90 court either lack evidentiary support or are controlled by an error of law." Id . at 429-30, 632 S.E.2d at 848.
III. Discussion
A. Attempted Suicide as Evidence of Guilt
1. Arguments
On appeal, Cartwright argues the Court of Appeals erred by finding the trial court did not abuse its discretion admitting evidence, including photographs, that Cartwright attempted to commit suicide while incarcerated. Cartwright maintains this evidence was irrelevant and, even if relevant, its probative value was substantially outweighed by its unduly prejudicial effect under Rule 403, of the South Carolina Rules of Evidence.
In regards to relevance, Cartwright asserts the State failed to establish a nexus between the suicide attempt and the charges against him. Cartwright maintains the nexus should involve much more than the defendant merely understanding he has been charged with committing a crime. While acknowledging he was aware of the charges, Cartwright asserts that, because he turned himself in, his subsequent attempted suicide cannot be viewed as relevant evidence of guilt and, therefore, admissible. Furthermore, Cartwright contends suicide is a complex act that, in his case, was caused by not being able to make bond and, as Cartwright maintains, the fact that his own daughter turned on him.
2. Analysis
"Evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy." Rule 401, SCRE ; State v. Alexander , 303 S.C. 377, 401 S.E.2d 146 (1991). "All relevant evidence is admissible, except as otherwise provided...." Rule 402, SCRE ;
*761 State v. Langley , 334 S.C. 643, 515 S.E.2d 98 (1999). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Rule 403, SCRE. "The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case."
**91 State v. Gillian , 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007). "Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis, such as an emotional one." State v. Wilson , 345 S.C. 1, 7, 545 S.E.2d 827, 830 (2001).
This Court has not addressed whether evidence of an attempted suicide is admissible as evidence of guilt. However, the Court of Appeals has held evidence of a suicide attempt is probative of a defendant's consciousness of guilt, so long as the circumstances justify an inference that the defendant's suicide attempt was motivated by his belief that he was being sought by authorities for the offense for which he is on trial. State v. Orozco , 392 S.C. 212, 708 S.E.2d 227 (Ct. App. 2011), overruled on other grounds by State v. Stukes , 416 S.C. 493, 787 S.E.2d 480 (2016) (overruling prior cases to the extent the holdings condoned the use of a jury instruction the Court deemed an impermissible charge on the facts). The court further held evidence of a suicide attempt is "generally admissible for whatever value the jury decides to give it." Id . at 220, 708 S.E.2d at 231. In so holding, the Court of Appeals reasoned that "[a suicide attempt] is easily analogized to other types of circumstantial evidence of guilt based on the accused's behavior after the crime." Orozco , 392 S.C. at 218, 708 S.E.2d at 230 ; see State v. Edwards , 383 S.C. 66, 72, 678 S.E.2d 405, 408 (2009) (holding witness intimidation evidence, if linked to the defendant, may be admitted to show a consciousness of guilt). We find the Orozco framework does not provide adequate safeguards, for suicide-attempt evidence is fraught with the potential for extreme prejudice. Because the admission of such evidence should be approached with the utmost caution, we decline to follow Orozco .
Evidence of attempted suicide is not easily analogized to evidence of guilt. Because this Court has not addressed whether evidence of an attempted suicide by a defendant is admissible, we surveyed other jurisdictions. As a result, we conclude that evidence of attempted suicide may be admitted, provided that the State establishes a clear and unmistakable nexus linking the suicide attempt to a guilty conscience derivative of the offense for which the defendant is on trial. We found a New Jersey case, State v. Mann , 132 N.J. 410, 625 A.2d 1102, 1107 (1993), instructive insofar as the admissibility of such evidence is concerned.
**92 In Mann , the New Jersey Supreme Court determined evidence of attempted suicide is admissible to show consciousness of guilt, but requires the trial court to hold a hearing outside the presence of the jury to evaluate whether evidence of the suicide attempt supports an inference that the defendant was seeking to avoid prosecution. Id . at 1108. The Mann court recognized that humans commit, and attempt to commit, suicide for a myriad of reasons including, but not limited to, prison conditions, family issues, financial problems, mental illness, emotional instability, disbelief in the justice system, stress, failure, and embarrassment. Id. Acknowledging the complex nature of the evidence, the Mann court instructed trial courts to consider defendants' alternative explanations, as well as the possible prejudice to a defendant from the introduction of the attempted suicide evidence. Additionally, the court noted trial courts "should ensure that a defendant has been given adequate notice of the State's intention to offer proof of the attempted suicide." Id.
Persuaded by the guidelines set forth in Mann , we decline to adopt a per se rule either admitting or excluding this evidence. Instead, we find its admission should be made on a case-by-case basis. Additionally, we specifically depart from Mann's requirement of jury instructions when suicide evidence is admitted.
Accordingly, in future cases, we instruct trial courts to conduct a hearing outside of the presence of the jury. During this hearing, at which the State and the defendant shall be permitted to introduce evidence, the trial court shall determine whether *762 the State has proven that: (1) a jury could reasonably find that a suicide attempt occurred; (2) the defendant was aware of the occurrence of the alleged crimes at the time of the suicide attempt; and (3) an unmistakable nexus exists by clear and convincing evidence linking the suicide attempt to a guilty conscience derivative of the offense for which the defendant is on trial. If the trial court concludes that the three factors have been established, the evidence is relevant and may be admitted, subject to a Rule 403, SCRE analysis. The suicide-attempt evidence may be admitted only when all three factors have been met, and the evidence survives a Rule 403 analysis. We recognize that in view of our **93 rigorous framework, suicide-attempt evidence will rarely be admitted.
While this case presents a close question, we find the facts here survive the strict test for admissibility, including the trial court's Rule 403 determination that the probative value of the suicide-attempt evidence was not substantially outweighed by the danger of unfair prejudice. Prison authorities found Cartwright hanging in his cell, the same day Cartwright was served with additional warrants. Cartwright admitted that he attempted suicide after he became aware of the new charges. The record further reflects Cartwright threatened to commit suicide if the victims (Daughter, Stepdaughter One, and Stepdaughter Two) told anyone about the sexual abuse. The fact that Cartwright acted on his threat and attempted suicide enhances the probative value of the evidence. Therefore, we hold evidence of Cartwright's suicide attempt was relevant and properly admitted.[2]
The final issue regarding suicide-attempt evidence is whether the trial court should charge the jury on such evidence. We have carefully canvassed the law in other jurisdictions, and we conclude the trial court shall not provide a limiting instruction or otherwise comment to the jury on this evidence. See S.C. Const. art. V, § 21 ("Judges shall not charge juries in respect to matters of fact, but shall declare the law."). The absence of a jury instruction shall in no manner foreclose the ability of the State and the defendant to make permissible jury arguments[3] respecting the jury's consideration of the suicide-attempt evidence.
B. Expertise and Bolstering
1. Arguments
Cartwright asserts the Court of Appeals erred in affirming the trial court's decision to qualify Dr. Alicia Benedetto as an expert in "child sexual abuse dynamics" where she acknowledged **94 her job was to conduct interviews and not conduct research or studies. Cartwright argues that, ultimately, Dr. Benedetto is a forensic interviewer giving the same testimony as a witness qualified in that area. Therefore, Cartwright maintains the trial court abused its discretion by qualifying Dr. Benedetto as an expert in "child sexual abuse dynamics" to render opinion testimony under Rule 702, SCRE.
2. Analysis
To be admissible, the trial court must first determine whether the expert testimony satisfies Rule 702, SCRE. Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Additionally, if the expert testimony is admissible under Rule 702, SCRE, the trial court must determine if its probative value is outweighed by its prejudicial effect. State v. Council , 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999).
Because child abuse assessment testimony is non-scientific, the trial court must determine whether: (1) the qualifications of the expert are sufficient; and (2) the expert's testimony will be reliable. State v. Chavis , 412 S.C. 101, 106-07, 771 S.E.2d 336, 339 (2015). "There is no formulaic approach *763 for determining the foundational requirements of qualifications and reliability in non-scientific evidence." Id . at 108, 771 S.E.2d at 339. "However, evidence of mere procedural consistency does not ensure reliability without some evidence demonstrating that the individual expert is able to draw reliable results from the procedures of which he or she consistently applies." Id .
Over defendant's objection, the trial court qualified Dr. Benedetto as an expert in clinical psychology and, citing State v. Weaverling , 337 S.C. 460, 523 S.E.2d 787 (Ct. App. 1999),[4] **95 allowed Dr. Benedetto "to render opinions on sexual abuse dynamics."
Dr. Benedetto graduated with a B.A. in psychology from New York University, and a Masters and Ph.D. from St. John's University. She completed her internship at William S. Hall Psychiatric Institute. Dr. Benedetto stated she was a licensed clinical psychologist and was the chief psychologist, for eleven years, at the Assessment and Resource Center (ARC), a children's advocacy center under the South Carolina Department of Mental Health. In that capacity, Dr. Benedetto explained "at the ARC, I conduct forensic interviews on a daily basis." Although Dr. Benedetto acknowledged there are many empirical studies on how children respond to abuse, she maintained that she was not a researcher, but instead a clinician.
While Dr. Benedetto's background and daily job duties consisted of conducting forensic interviews, the admission of which this Court cautioned against in State v. Kromah ,[5] Dr. Benedetto's education, formal training, and significant contact with sexually abused children qualified her to give an opinion on the behavioral characteristics of sexually abused children. See State v. Jones , 417 S.C. 319, 790 S.E.2d 17 (Ct. App. 2016) (holding expert's testimony on "child sex[ual] abuse dynamics" properly admitted by trial court because the testimony was reliable and the subject was beyond the ordinary knowledge of the jury); State v. Barrett , 416 S.C. 124, 785 S.E.2d 387 (Ct. App. 2016) (finding no error in the trial court qualifying victim's forensic interviewer as an expert mental health professional in the area of child sexual abuse characteristics where the expert was a licensed professional counselor with a master's degree in clinical psychology). Therefore, we find the trial court did not err in qualifying Dr. Benedetto as an expert in "child sexual abuse dynamics."
**96 Even if Dr. Benedetto was properly qualified as an expert, Cartwright contends her testimony was highly prejudicial. Cartwright maintains that, because Dr. Benedetto's testimony mirrored the claims in his case, her testimony was the equivalent of improper bolstering by a forensic interviewer. Cartwright's contention is meritless. Cartwright ignores the fact that Dr. Benedetto is not the typical forensic interviewer. Dr. Benedetto has advanced educational degrees in psychology and has formally studied human behavior.
Cartwright is correct that "[w]hile experts may give an opinion, they are not permitted to offer an opinion as to the credibility of others." State v. Chavis , 412 S.C. 101, 109, 771 S.E.2d 336, 340 (2015). " 'Specifically, it is improper for a witness to testify as to his or her opinion about the credibility of a child victim in a sexual abuse matter.' " Id . (quoting Kromah , 401 S.C. at 358-59, 737 S.E.2d at 500 (cautioning forensic interviewers to avoid "any statement that indirectly vouches for the child's believability") ); see State v. Jennings , 394 S.C. 473, 480, 716 S.E.2d 91, 94 (2011) (finding error where there was "no other way to interpret the language used in the reports other than to mean the forensic interviewer believed the children were being truthful"). Further, "[i]t is axiomatic that the credibility of the testimony *764 of these witnesses is for the jury." State v. Wright , 269 S.C. 414, 417, 237 S.E.2d 764, 766 (1977).
We find Dr. Benedetto's testimony did not improperly bolster the victims' credibility. Rather, her testimony served the purpose of explaining the behaviors common to sexually abused children. Here, she never interviewed the victims and never stated she believed the victims were telling the truth. Dr. Benedetto simply described, in general terms, the reasons why children recant. Additionally, Dr. Benedetto explained that abusers often bought gifts for victims, that victims are often threatened about disclosure of the abuse, and that victims may start to act out and begin drinking or using drugs. Thus, although Dr. Benedetto's testimony corroborated some of the minor victims' general behavior, she properly testified in broad terms based on her expert qualifications. Therefore, the Court of Appeals correctly determined Dr. Benedetto's **97 testimony did not result in improper vouching for the credibility of the victims.
IV. Conclusion
Based on the foregoing, we: (1) affirm the decision of the Court of Appeals holding the trial court did not abuse its discretion admitting evidence of the attempted suicide; (2) set forth the framework trial courts must apply in future cases when evidence of a suicide attempt is offered to prove consciousness of guilt; (3) affirm the decision of the Court of Appeals finding the trial court correctly qualified Dr. Benedetto as an expert in clinical psychology and allowed her to render an opinion on "child sexual abuse dynamics"; and (4) affirm the decision of the Court of Appeals determining Dr. Benedetto's testimony did not constitute improper bolstering.
AFFIRMED.
KITTREDGE and JAMES, JJ., concur. HEARN, J., concurring in a separate opinion in which Acting Justice J. Cordell Maddox, Jr., concurs.
I write separately to express my view that evidence of a suicide attempt, standing alone, is not probative of guilt and should not be admitted into evidence. However, because I believe any error in admitting Cartwright's suicide attempt in this case was harmless, I concur in the result reached by the majority.
Like the majority, I disagree with the court of appeals that a suicide attempt is easily analogized to other types of circumstantial evidence of guilt. See State v. Onorato , 171 Vt. 577, 762 A.2d 858, 859-60 (Vt. 2000) ("The underlying reasons motivating an attempt to take one's life can be both numerous and highly complex, and may be even less indicative of guilt than flight evidence."). I do not, for example, find evidence of a suicide attempt similar to evidence of flight or witness intimidation or other incriminating behavior following the commission of a crime. In my view, a suicide attempt without some tangible inculpatory evidence-such as a note penned in the defendant's hand which states that his suicide was motivated **98 by guilt stemming from his commission of the crime-should never be admitted. See Stephenson v. State , 29 N.E.3d 111, 120 (Ind. 2015) ("We decline to find that the mere existence of an attempted suicide, without more, is relevant evidence of a person's guilty conscience about committing a charged crime, ...."). While I disagree with the result ultimately reached by the Supreme Court of New Jersey in State v. Mann, 132 N.J. 410, 625 A.2d 1102 (N.J. 1993), it recognized that the reasons people commit suicide and attempt to commit suicide are diverse and complex. A panoply of mental and emotional health issues factor into a person's decision to take his or her own life and without clear corroboration that the attempt was motivated by guilt, such evidence is simply too speculative in my view to be admissible in a criminal trial. Even prior to the turn of the twentieth century, courts recognized suicide and attempts to commit suicide may be brought about by numerous factors, including prison conditions, family issues, financial problems, mental illness, emotional instability, lack of confidence in the justice system, stress, failure, and embarrassment-all factors that can weigh heavily on the minds of the guilty and not guilty alike. See State v. Coudotte , 7 N.D. 109, 72 N.W. 913, 916 (N.D. 1897) ("When we *765 essay the task of accounting for suicide on any general grounds, we undertake a task that, from its very nature, is impossible of performance. The human mind is so wonderfully, yet so delicately, constructed, the human passions are so powerful, yet so varied, that it is idle for any one person to pretend to enter the consciousness of another, and account for the inner workings of that other mind."). Absent tangible evidence that connects the suicide attempt to consciousness of guilt, I do not believe a defendant's actions in trying to take his own life should be brought before the jury.
Nonetheless, in this case, there was overwhelming evidence of the defendant's guilt apart from his suicide attempt, including DNA evidence recovered from Stepdaughter Two's bed sheets. Accordingly, although I would find error in the admission of Cartwright's suicide attempt into evidence, I would deem it harmless and affirm his conviction.
Acting Justice J. Cordell Maddox, Jr., concurs.

Daughter also stated her husband, Kevin Autry (Kevin), was convicted in 2000 for second-degree CSC with a minor in which she was the victim. Cartwright's trial counsel suggested Cartwright pushed the prosecution of Kevin. In response, Daughter denied that her testimony was the result of a grudge she held against Cartwright.

Likewise, Cartwright's complaint of undue prejudice from the admission of two photographs of his prison cell is meritless.

We do not suggest there are no limits to a party's jury argument, for the law provides limits, as enhanced by Due Process protections.

In Weaverling , the Court of Appeals determined "[e]xpert testimony concerning common behavioral characteristics of sexual assault victims" is not only relevant, but also "helpful in explaining to the jury the typical behavior patterns of adolescent victims." 337 S.C. at 474-75, 523 S.E.2d at 794. Additionally, the court concluded "[t]here is no requirement the sexual assault victim be personally interviewed by the expert before the expert can give behavioral evidence testimony." Id. at 475, 523 S.E.2d at 794.

401 S.C. at 357 n.5, 737 S.E.2d at 499 n.5 (stating "we can envision no circumstance where [forensic interviewers'] qualification as an expert at trial would be appropriate").