# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Barry Wayne Jones, Appellant.

Appellate Case No. 2022-000046

———

Appeal From Edgefield County
Walton J. McLeod, IV, Circuit Court Judge

———

Opinion No. 6147
Heard March 11, 2025 – Filed June 10, 2026

———

**AFFIRMED**

———

Senior Appellate Defender Lara Mary Caudy, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, Assistant
Attorney General Richard Brandon Larrabee, all of
Columbia; and Solicitor Samuel R. Hubbard, III, of
Lexington, all for Respondent.

———

**MCDONALD, J.:** An Edgefield County jury convicted Barry Wayne Jones of the murder of Milledge Hall and acquitted him of the subsequent attempted murder of a police officer. Jones appeals his murder conviction and sentence, arguing the circuit court erred in (1) denying him immunity from prosecution under the Protection of Persons and Property Act; (2) declining to exclude evidence that he

attempted suicide shortly before he was taken into custody; and (3) failing to tailor the self-defense instruction to adequately reflect the facts and theories Jones presented at trial. We affirm the conviction and sentence.

**Factual and Procedural Background**

Numerous witnesses testified at Jones's pretrial immunity hearing and at his subsequent trial. Jones testified at both proceedings as to his background, the incidents leading up to the day of the shootings, and the events for which he was indicted. Jones explained that after the death of his wife, he took early retirement from his job at the Savannah River Site (SRS) and moved back to Johnston, where he became a frequent patron at the Johnston Pool Room, a local sports bar. Jones began dating Angie Smith in September 2017 and eventually moved in with her. During their relationship, Angie introduced Jones to her cousin, Milledge "B'Boy" Hall (Decedent).

In late 2017, Decedent's grandson, Clayton Hall (Hall), and his wife purchased the Pool Room. Decedent invested in his grandson's business and occasionally helped with cleaning and other tasks. Decedent was also a frequent patron and often visited with friends and family at the Pool Room.

From the time Hall purchased the Pool Room, he had "frustrations" with Jones. Jones criticized how Hall ran the business and complained about the food, the staff's clothing, the temperature, and the fact that Hall allowed smoking. Jones's criticisms bothered Hall and "the entire bar staff," but his behavior had not yet caused Hall to ban Jones from the establishment or call the police.

In April 2018, Jones learned Decedent had been telling others that Jones was fired from his job at SRS. This upset Jones because he considered his early retirement "deeply personal." When Jones asked Decedent if he was spreading these rumors, Decedent admitted that he told others Jones was fired but refused to tell Jones from whom he learned this. During this exchange, Decedent quickly stood up from his bar stool and "got all up in [Jones's] face." According to Jones, he "had to start backing up to get away from [Decedent] and put [his] hands up like this, like, whoa." Jones stated Decedent also told him, "I'll beat your little a-s-s all about this bar." On this occasion, Jones and Angie immediately left, and Jones stopped going to the Pool Room so often. He further claimed that when he did go, he kept his distance from Decedent.

On Saturday, May 5, 2018, Jones and Angie were back at the Pool Room. Jones believed there was an error of approximately fifty cents on his bill, and he brought this to the attention of his server. Hall testified that Jones argued with him over the discrepancy in an "aggressive tone," but Jones denied losing his cool that day. The next morning, Hall and his wife decided to take an overnight trip to "get out of town specifically due to stress from Jones." Hall also told Decedent that the next time he saw Jones, he was "gonna ask him not to come back to the establishment anymore." Decedent advised Hall to have this conversation with Jones outside to avoid disturbing other patrons or embarrassing Jones.

Two days later, Jones checked on his elderly father and ran some errands before stopping at the Pool Room between 4:00 and 4:45 p.m. to meet friends. As Jones socialized, he realized he had missed Angie's text messages at 5:06 and 5:15 p.m. Jones responded at 5:17, apologizing for not hearing the text notices and letting Angie know he was at the Pool Room. Angie then sent a series of texts stating, "[W]hat? I can't believe you. . . . [W]e're not gonna make it like this. You need to come talk to me. . . . I'm really pissed now. . . . If you don't come talk to me, it won't be pretty when you get home. . . . Answer me. . . . I'll come show out." Jones did not respond to these texts.

A few minutes later, Angie strolled into the Pool Room and declined to acknowledge Jones. Instead, she went to the back of the bar and sat next to Decedent. Jones claimed that at that point, he decided to leave. He also decided he was finished with Angie—he planned to break up with her and move out of her house. Jones left the Pool Room at 6:30 p.m. and was followed by his friend, Randy Yonce; Decedent walked outside at 6:31. As Jones pulled out of the parking lot, Decedent slapped the rear right fender of Jones's silver Mercedes sedan, yelled something, and threw his hands up in the air. Jones claimed this startled him as he was pulling out onto the road.

Jones drove straight to Angie's house and packed his valuables, including his mail, medicine, a safe, several Clemson shirts his wife had given him, and a bag of guns—along with magazines and ammunition. Between 6:33 and 6:47 p.m., Angie sent Jones a series of texts: "You couldn't even come and speak"; "Everyone stared at me"; and "See you soon. No fighting." Jones claims he interpreted this final text to mean Angie had calmed down and that it was safe for him to return to the Pool Room.

At 6:49 p.m., Jones texted his friend, Joe Mims, "Can you come calm me down?" Thirty seconds later, he sent Mims another text, which read, "I'm gonna kill that

BBoy."  Jones maintains he was merely venting his frustrations and denies that this text suggested he was literally going to kill B'Boy.  At 6:52 p.m., Jones texted a Johnston Police Department sergeant to ask if he was available to be at the Pool Room while he broke up with Angie, but the officer did not respond.[1]

At 7:06 p.m., Jones parked directly in front of the Pool Room in the hope that Angie would see his car and come outside to talk.  Jones claimed he planned to call or text Angie if she did not come outside on her own.  But after Jones had been sitting in the parking lot for several minutes, Decedent walked outside and approached his vehicle.[2]  Decedent motioned for Jones to get out of the car, but Jones refused because he was "scared of him."  Instead, Jones rolled down his window about six inches—he testified that he did not want to roll it down any farther because he did not know if Decedent "was gonna grab [him] and [pull] him out of the car."  Jones stated Decedent berated him for nearly ten minutes about his treatment of Angie and for trying to ruin the Pool Room.  Jones testified that when he started his car to "try to leave," Decedent lunged at him several times while repeatedly demanding that he exit his vehicle so Decedent could "beat [his] ass."  Jones smelled alcohol on Decedent's breath and alleged he felt "threatened" and "fearful [for his] life."[3]  According to Jones, Decedent presented a gun, returned it to his waistband, and later pulled up his shirt again to show Jones the weapon.[4]  At that point, Jones felt "threatened for [his] life," reached for his gun bag on the back seat, and grabbed "the first gun [he] could get off the top."

Jones testified that he placed this gun on his lap and rolled down his window as Decedent became increasingly angry about his refusal to get out of the car to fight.  Although Jones admitted that Decedent told him to leave the premises, he stated he

[1] Jones knew this officer from the Pool Room and testified that he had previously asked him to help him calm Angie when she was drinking.

[2] One of the Pool Room patrons, Roger Bryan, had reported Jones's return.  Bryan witnessed Decedent point at Jones in a manner indicating Jones should leave; Decedent then "turned and started back towards the building and [Jones] must have said something to him. . . .That's when [Decedent] raised his hands again like telling him to leave again."

[3] At the time of his death, Decedent was 6'1" and weighed approximately 300 pounds; his blood alcohol content was 0.12.  Decedent's widow testified that he was still under a doctor's care following a 2016 triple bypass surgery.

[4] The State contends this object was a phone.  Multiple witnesses testified that Decedent did not own or carry a gun, and no gun was found.  Jones did not deny that Decedent had a large phone clipped to his right front pocket.

did not want to back out of the parking lot until Decedent returned inside the bar. The video reflects that Decedent began walking toward the bar door before abruptly spinning around and heading back towards Jones's sedan. Although Jones admitted Decedent was still telling him to leave at this time, Jones exited his vehicle and shot him, twice.[5]

At his trial, Jones explained:

> There's a certain point where I can't see his right hand. I know he's got a gun. I know he can draw it, and it gets to the point where I don't feel safe at all. My life is threatened and on the line and my heart's beating 150 beats per minute.

Once Decedent was on the ground and his friends began coming outside, Jones returned to his car and drove away.

Captain James Florida of the Edgefield County Sheriff's Office (ECSO) was off duty when he heard the dispatch call reporting the Pool Room shooting and the suspect's silver Mercedes. He saw a silver Mercedes at an intersection, ran the tag, and began following Jones. Florida testified that he did not initially activate his blue lights because he was waiting for backup before attempting to stop the suspect's vehicle.[6] Jones also described this pursuit, contending the officer was "laying way back" from his car before aggressively pulling up very close like he was going to "run me off the road." Jones claimed that the last time the officer pulled up close, Jones saw a gun in his hand. Once the officer backed away again, Jones turned onto Pleasant Lane, hoping to lose him.

---

[5] Betty Edwards, who was shopping at a nearby IGA, "heard a confrontation between two people . . . . [she] couldn't hear what they [were] saying, but . . . it was loud." She identified the individuals as Decedent and the "gentleman that was in the car." Another witness, Lanyce Hatcher, testified that when he arrived at the Pool Room, Decedent "was arguing with somebody in a car. I couldn't see who was in the car, but you could tell they were arguing." Decedent said "no, I'll tell you what you're gonna do, you're gonna leave and not come back, and that's— that's all I heard and by then I was almost to the door and I didn't hear any more."
[6] Captain Florida's dashcam was not working properly on the day of the murder, but dashcam footage from Corporal Keith Kathman, a City of Edgefield police officer providing backup, supports Florida's version of Jones's attempted ambush.

Jones then turned onto Log Creek Road and "threw" his vehicle in park, retrieved an AR-15 style rifle from his trunk, and moved the assault weapon to his back seat when the officer "sped by." Jones explained that once he found "somewhere safe," he backed into a small clearing, exited his car, and started drinking a beer. He claimed the officer then drove by and fired a weapon at him before stopping and—unprovoked—firing at him again. Jones testified that only then did he return fire; he maintained he felt "helpless" because "somebody was trying to kill [him]" and he thus decided "that no matter who was in the car that [he] had to defend [himself]."

Captain Florida's description of his encounter with Jones differed significantly. Florida testified that he lost sight of Jones when he veered off onto Pleasant Lane. As Florida drove slowly looking for the silver sedan, he saw that Jones had "turned his vehicle facing Pleasant Lane on Log Creek Road which is a dirt road." The driver's side door was open, and Jones "was standing outside aiming the assault rifle at [Florida]." Florida then accelerated past Jones, radioed to report that the suspect was armed with an AR-15, and "started hollering to [Corporal Kathman] on the radio to back up, back up." At this time, Jones began shooting at him.[7]

While taking cover, Florida initially returned fire with his Glock but switched to his shotgun. After Jones shot out the back window of Florida's marked patrol vehicle, Jones "turned and started shooting toward Officer Kathman." Jones sustained several gunshot wounds, including a self-inflicted shot to his chin/neck area. Jones later told Florida "that he wanted [him] to let him bleed to death," but Florida responded that he could not do that."[8] Eventually, other officers who had arrived on scene pulled Jones from behind his car, handcuffed him, and placed him on an ambulance stretcher for transport to the hospital.

Jones was indicted for Decedent's murder and the attempted murder of Captain Florida. After a two-day hearing, the circuit court found Jones was not entitled to immunity under the Protection of Persons and Property Act. Following his subsequent seven-day trial, the jury convicted Jones of Decedent's murder but

---

[7] Florida knew Kathman was also in pursuit and explained that he did not want him to enter Jones's line of fire. Kathman confirmed that Jones "shot first at us."

[8] Jones denied saying this. Instead, Jones claimed he asked for help and Florida responded that he could not do that. Jones testified, "That's what I remember as far as I cannot do that and also he told me even while I was laying back on the ground, I couldn't hardly move at all, he told me that he was gonna get his fully automatic AR-15 and come kill me."

acquitted him of the attempted murder of Captain Florida. The circuit court sentenced Jones to thirty-five years' imprisonment. Jones filed a motion for a new trial, which the circuit court denied. Jones timely appealed.

**Law and Analysis**

    **I.    Protection of Persons and Property Act**

Jones argues the circuit court erred in denying him immunity from prosecution because he proved by a preponderance of the evidence that he was entitled to immunity under the Protection of Persons and Property Act (the Act).[9] We disagree.

"Circuit courts utilize pretrial hearings to determine whether a defendant is entitled to immunity under the Act, employing a preponderance of the evidence standard." *State v. McCarty*, 437 S.C. 355, 365, 878 S.E.2d 902, 908 (2022) (quoting *State v. Cervantes-Pavon*, 426 S.C. 442, 449, 827 S.E.2d 564, 567 (2019)). "This Court, in turn, reviews an immunity determination for an abuse of discretion." *Id.* "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Id.* (quoting *State v. Jones*, 416 S.C. 283, 290, 786 S.E.2d 132, 136 (2016)).

The Act grants a person immunity "'from criminal prosecution and civil action for the use of deadly force' in circumstances that are permitted by the Act or by another provision of law." *McCarty*, 437 S.C. at 366, 878 S.E.2d at 908 (quoting S.C. Code Ann. § 16-11-450(A) (2015)). The General Assembly stated its intent in section 16-11-420 of the South Carolina Code (2015):

> (A) It is the intent of the General Assembly to codify the common law Castle Doctrine which recognizes that a person's home is his castle and to extend the doctrine to include an occupied vehicle and the person's place of business.
>
> (B) The General Assembly finds that it is proper for law-abiding citizens to protect themselves, their families, and others from intruders and attackers without fear of

---

[9] S.C. Code Ann. §§ 16-11-410 to -450 (2015).

prosecution or civil action for acting in defense of themselves and others.

. . . .

(E) The General Assembly finds that no person or victim of crime should be required to surrender his personal safety to a criminal, nor should a person or victim be required to needlessly retreat in the face of intrusion or attack.

Section 16-11-440 of the South Carolina Code (2015) sets forth the circumstances under which the Act allows the use of deadly force. In relevant parts, the statute provides:

(A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:

(1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if he removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle; and

(2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.

. . . .

(C) A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death

or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16-1-60.

In *State v. Curry*, our supreme court discussed "the legislative intent regarding a trial court's authority to weigh the underlying claim of self-defense in determining an accused's entitlement to immunity." 406 S.C. 364, 371, 752 S.E.2d 263, 266 (2013). "Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity. This includes all elements of self-defense, save the duty to retreat." *Id.*; *accord Jones*, 416 S.C. at 301, 786 S.E.2d at 141. The court then noted the elements necessary to establish a claim of self-defense:

> First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*Curry*, 406 S.C. at 371 n.4, 752 S.E.2d at 266 n.4 (quoting *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984)). "It is the fourth element—the duty to retreat—that is excused under the Act and the Castle Doctrine." *Id.*

Jones claims he is entitled to immunity because he feared for his life and was "not at fault in bringing on the difficulty" with Decedent. The circuit court properly rejected this assertion. Although Jones may have been preoccupied with his decision to end his relationship with Angie—and it is undisputed that he had no interaction with Decedent on the day of the shooting until Decedent slapped

Jones's car when he first left the parking lot—such does not negate the fact that Jones returned to the Pool Room parking lot just thirty-five minutes later with a veritable arsenal.

Jones argues that when Decedent "aggressively struck" the rear of his car, it "caused Appellant renewed fear of [Decedent] after [Decedent]'s threat against Appellant about a month prior coupled with Appellant's knowledge of [Decedent]'s reputation for violence."[10]  However, Jones's decision to return to the Pool Room parking lot that night belies any claimed feelings of "renewed fear."  Even if one accepts Jones's claim that he only returned to the Pool Room to end things with Angie, his decision to return necessarily factors into the immunity analysis.  Further, during the short period of time in which Jones left and returned to the Pool Room parking lot with his bag of guns; several magazines; and ammunition, he texted Mims, "I'm gonna kill that BBoy."  Although Jones asserted he was merely venting and denied this text meant he intended to kill anyone, the fact remains that he returned to the Pool Room—heavily armed—a mere seventeen minutes after sending this text.  Thus, in our view, Jones failed to establish by a preponderance of the evidence that he was without fault in "bringing on the difficulty."

But even if we accept for purposes of argument that Jones was without fault in bringing on the difficulty, his self-serving testimony is the only evidence in the record suggesting Jones was in imminent danger (or, indeed, any danger at all).  After reviewing the surveillance video, we are unable to identify the black object that Jones argues was Decedent's gun.  Multiple witnesses testified Decedent did not own or carry a gun, and no gun was found on or anywhere near him just after the shooting.  Still, we recognize Jones's implication that Roger Bryan can be seen picking up the "black object" in the surveillance video.[11]

Jones also disputes that Decedent asked him to leave the premises early into their approximately ten-minute encounter, although he admits Decedent eventually did ask him to leave.  Hatcher, who saw the two men arguing, testified that Decedent said "no, I'll tell you what you're gonna do, you're gonna leave and not come back, and that's—that's all I heard and by then I was almost to the door and I didn't hear any more."  Jones maintains he started his vehicle because he wanted to leave but

[10] In addition to Jones's testimony that Decedent had previously threatened to beat him up, Jones's friend, Tony Friar, testified that Decedent "was a fighter based on what [he] knew about [Decedent] *in elementary school*" and that Decedent previously told Friar he was going to "take care" of Jones.
[11] Only Jones claims to have seen a gun, and we do not see this on the video.

was afraid to do so because he "believed using his hands to operate the vehicle and taking his eyes off of [Decedent] even for an instant would expose him to further harm." Yet, we note that even when Decedent initially walked away from Jones's vehicle to go back inside the Pool Room, Jones made no attempt to leave—and some witnesses testified Jones called to the Decedent as Decedent walked away.

Jones next argues that even if his self-defense claim fails in one or more respects, he is still entitled to immunity under sections 16-11-440(A) and (C). As noted above, Jones testified that Decedent demanded that he exit his vehicle and fight him. He further alleges Decedent, "pulled on [his] door handle to check and see if it was locked or not" and "put his hands on top of the vehicle." These actions might approach the statute's intent to protect against someone "unlawfully and forcefully entering . . . [an] occupied vehicle" or "attempting to remove another person against his will from entering . . . [an] occupied vehicle," but only if the person making such claims is credible. And Jones is not credible—indeed, like Officer Kathman's dashcam video, the parking lot surveillance video (along with the testimony of multiple witnesses) contradicts Jones's story. *See, e.g.*, *State v. Oates*, 421 S.C. 1, 13, 803 S.E.2d 911, 918 (Ct. App. 2017) (reiterating that a trial court is not required "to accept the accused's version of the underlying facts" in considering a claim of immunity (quoting *Curry*, 406 S.C. at 371, 752 S.E.2d at 266)). The surveillance video shows that when Jones exited his vehicle and fired at Decedent, Decedent was merely reapproaching the front of the Mercedes from the Pool Room's entrance; he was neither close enough to "unlawfully and forcefully" enter (or try to enter) the car nor in a position to try to remove Jones from it. Finally, while it is undisputed that Jones was initially "not engaged in an unlawful activity" and was in a "place where he ha[d] a right to be," Jones lost his right to be on the Pool Room premises when Decedent asked him to leave. For all of these reasons, we find the circuit court did not abuse its discretion in ruling Jones failed to prove by a preponderance of the evidence that he was entitled to immunity.

## II.    Evidence of Attempted Suicide

Jones next contends the circuit court erred in denying his motion to exclude evidence that he attempted suicide in the moments before he was taken into custody. He argues *State v. Cartwright* precluded this evidence because the State failed to prove "an unmistakable nexus exists by clear and convincing evidence linking the suicide attempt to a guilty conscience derivative of the offense for which the defendant is on trial." 425 S.C. 81, 92, 819 S.E.2d 756, 762 (2018). Jones further asserts that the probative value of this evidence was substantially

outweighed by the danger of unfair prejudice.  *See* Rule 403, SCRE.  Again, we disagree.

"The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice."  *Cartwright*, 425 at 89, 819 S.E.2d at 760 (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847-48 (2006)).  "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law."  *Id.* at 89-90, 819 S.E.2d at 760 (quoting *Douglas*, 369 S.C. at 429-30, 632 S.E.2d at 848).  "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina."  Rule 402, SCRE.  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Rule 403, SCRE.  "The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case."  *State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007).

Evidence of attempted suicide may be admitted if the State establishes:

> (1) a jury could reasonably find that a suicide attempt occurred; (2) the defendant was aware of the occurrence of the alleged crimes at the time of the suicide attempt; and (3) an unmistakable nexus exists by clear and convincing evidence linking the suicide attempt to a guilty conscience derivative of the offense for which the defendant is on trial.  If the trial court concludes that the three factors have been established, the evidence is relevant and may be admitted, subject to a Rule 403, SCRE analysis.

*Cartwright*, 425 S.C. at 92, 819 S.E.2d at 762.  "Clear and convincing evidence is that degree of proof which will produce in the minds of the trier of facts a firm belief as to the allegations sought to be established."  *In re Dickey*, 395 S.C. 336, 354, 718 S.E.2d 739, 748 (2011) (quoting  *Peeler v. Spartan Radiocasting, Inc.*, 324 S.C. 261, 265 n.4, 478 S.E.2d 282, 284 n.4 (1996)).  This is an intermediate

measure of proof, "more than a mere preponderance" but less than that "required for proof beyond a reasonable doubt; it does not mean clear and unequivocal." *Id.*

In *Cartwright*, the appellant was charged with molesting his daughter and two stepdaughters. 425 S.C. at 85, 819 S.E.2d at 758. While he was detained prior to trial, Cartwright attempted suicide by hanging himself from his bunk with a sheet wrapped tightly around his neck. *Id.* at 89, 819 S.E.2d at 760. Noting the case presented "a close question," our supreme court found:

> [T]he facts here survive the strict test for admissibility, including the trial court's Rule 403 determination that the probative value of the suicide-attempt evidence was not substantially outweighed by the danger of unfair prejudice. Prison authorities found Cartwright hanging in his cell, the same day Cartwright was served with additional warrants. Cartwright admitted that he attempted suicide after he became aware of the new charges. The record further reflects Cartwright threatened to commit suicide if the victims (Daughter, Stepdaughter One, and Stepdaughter Two) told anyone about the sexual abuse. The fact that Cartwright acted on his threat and attempted suicide enhances the probative value of the evidence. Therefore, we hold evidence of Cartwright's suicide attempt was relevant and properly admitted.

*Id.* at 93, 819 S.E.2d at 762.

Here, ECSO Deputy Robert Harter participated in the takedown on Log Creek Road. Harter was one of the officers who converged on Jones as he was lying on the ground near his vehicle. When Harter approached, he saw two weapons on the ground next to Jones: an "AR-15 type rifle" and a silver .38 revolver. Once Jones was in handcuffs, "[s]omeone asked [him] if he was hurt because he had a lot of blood on the front of him. He did say that he was hurting and that he had shot himself." Jones did not "give any explanation for why he shot himself" and he did not mention the word "suicide." In a statement prepared shortly after the event, Harter wrote that Jones said "he was hurting and had tried to shoot himself under the chin."

Sergeant James Morgan arrived on the Log Creek scene after the gunfire had ceased but before Jones was taken into custody. He and Sergeant James Densmore moved in to arrest Jones when Captain Florida gave the command. Once Jones was in custody and handcuffed, Morgan asked "about his current medical state." Jones told Morgan "where he was shot at, where he was hurting at, around his chest, stomach, arm there, and then he lifted his head and he said I'm also shot here." Jones then volunteered, "I tried to kill myself and I couldn't even do that."

Jones was already in custody when Officer Samuel Sherrill arrived. Sherrill accompanied Jones to the ambulance and rode with him to the hospital. He testified that while on the stretcher, Jones said, "I wish y'all would have killed me. . . . Y'all should have just let me die." Later, on the way to the hospital, Jones said, "The only hole that hurts is the one . . . I put in my neck."

While Jones conceded at trial that the State met its burden of proof as to the first two elements of the *Cartwright* analysis, he asserts the State failed to prove by clear and convincing evidence that he "tried to commit suicide because he feels so guilty [about] his participation in the shootout with law enforcement on Log Creek Road that he's just going to commit suicide over his guilt over those two things." Emphasizing our supreme court's finding in *Cartwright* that "suicide attempt evidence is fraught with the potential for extreme prejudice," 425 S.C. at 91, 819 S.E.2d at 761, Jones argues any probative value such evidence might have was substantially outweighed by the danger of unfair prejudice.

The circuit court disagreed, finding the State met all three *Cartwright* factors. The circuit court noted the chain of events, including the Pool Room shooting; the events leading up to the confrontation with law enforcement some forty minutes later; and Jones's own statements about his self-inflicted wound "demonstrate a nexus by clear and convincing evidence of attempted suicide that can be linked to a guilty conscience." The court then explained that in light of the specific facts of this case, "the highly probative nature that encapsulates that entire story of facts outweighs the prejudicial effect of the evidence of attempted suicide."

Although there is no testimony that conclusively establishes why Jones shot himself, his own actions and statements demonstrate "an unmistakable nexus exists by clear and convincing evidence linking the suicide attempt to a guilty conscience derivative of" the offenses for which Jones was on trial. *Cartwright*, 425 S.C. at 92, 819 S.E.2d at 762. First, if Jones believed he acted in self-defense in shooting Decedent, there was no need for him to flee the scene with his weapons and ammunition, hunker down, and engage law enforcement in a shootout. Jones

claims his "encounter with law enforcement served as a break in the causal chain between [Jones] shooting [Decedent] in self-defense and his suicide attempt where almost an hour passed between when [Jones] shot [Decedent] and when he attempted suicide, particularly where [Jones] did not attempt suicide during that hour."

We see no such break in the causal chain and find the circuit court properly exercised its discretion in denying Jones's motion to exclude evidence of his suicide attempt. There is no evidence in the record to suggest Jones was suicidal on the day he armed himself and returned to the Pool Room after threatening by text to "kill that BBoy" or that he made any statements suggesting he was suicidal before starting his shootout with law enforcement. Nor did the circuit court abuse its discretion in finding the probative value of Jones's suicidal actions and statements was not substantially outweighed by the danger of unfair prejudice. *See Gillian*, 373 S.C. at 609, 646 S.E.2d at 876 (explaining a Rule 403 "determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case").

### III. Jury Charge – Self Defense

Finally, Jones argues the circuit court erred in failing to tailor the self-defense charge to adequately reflect the facts and theories he presented at trial. He contends the circuit court should have instructed the jury that Jones had the right to act under the law of self-preservation to prevent his assailant from "getting the drop on him." He asserts such a tailored charge was supported by the evidence and crucial to the jury's understanding of the law of self-defense. We see no error in the circuit court's well-reasoned, tailored instruction.

"In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Zeigler*, 364 S.C. 94, 106, 610 S.E.2d 859, 865 (Ct. App. 2005). "A jury charge which is substantially correct and covers the law does not require reversal." *Id.* "To warrant reversal, a trial judge's charge must be both erroneous and prejudicial." *State v. Otts*, 424 S.C. 150, 155, 817 S.E.2d 540, 543 (Ct. App. 2018) (quoting *State v. Taylor*, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003)).

Jones submitted numerous written charge requests including "Request to Charge No. 6," which addressed self-defense and the right to act on appearances. The requested charge stated, in pertinent part:

> One who acts in self-defense may act on appearances.
> He may be mistaken. The law does not hold him to a
> *refined assessment* of the danger, provided, of course, he
> acted as the person of ordinary coolness and courage
> would have acted or should have acted in meeting the
> appearance of danger. He doesn't have to wait until his
> assailant gets the drop on him. He has a right to act
> under the law of self-preservation and prevent his
> assailant getting the drop on him; if it is apparent, or
> reasonably apparent his assailant is taking steps to get the
> drop on him, one who acts in self-defense must take steps
> first to prevent such assailant from getting the drop on
> him. *See State v. Rash*, 182 S.C. 42, 50 (1936); *State v.
> Starnes*, 340 S.C. 312, 322 (2000).

Following a lengthy charge conference in chambers, defense counsel put his arguments on the record, specifically objecting to the circuit court's ruling not to charge "Request to Charge No. 6" in full. The circuit court acknowledged it did not "take [the] charge verbatim," but noted it granted the request in part.

The circuit court ultimately gave the following charge as to a defendant's right to act on appearances:

> The defendant does not have to show that he was actually
> in danger. It is enough if the defendant believed he was
> in imminent danger and a reasonably prudent person of
> ordinary firmness and courage would have had the same
> belief. One who acts in self-defense may act on
> appearances. He may be mistaken. The law does not
> hold him to a refined assessment of the danger, provided,
> he acted as the person of ordinary coolness and courage
> would have acted or should have acted in meeting the
> appearance of the danger. It is for you to decide whether
> the defendant's fear of immediate danger of death or
> serious bodily injury was reasonable and would have
> been felt by an ordinary person in the same situation.

"[T]he trial court is required to charge only the current and correct law of South Carolina.'" *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011) (quoting *Sheppard v. State*, 357 S.C. 646, 665, 594 S.E.2d 462, 472 (2004)). "The

law to be charged must be determined from the evidence presented at trial." *State v. Cole*, 338 S.C. 97, 101, 525 S.E.2d 511, 512 (2000). "The substance of the law is what must be instructed to the jury, not any particular verbiage." *State v. Angie*, 315 S.C. 547, 554, 446 S.E.2d 411, 415 (1994).

Here, the circuit court properly declined to give the defense's requested charge verbatim and correctly addressed the substance of the law, including the legal tenet that "one who acts in self-defense may act on appearances." The circuit court instructed the jury on this point even though the video evidence suggests Decedent was not attempting to forcibly (or otherwise) enter Jones's vehicle or remove Jones from it and was not pointing—or in possession of—any weapon. The charge included language instructing that the law does not hold a defendant to a "refined assessment of the danger" and that a defendant may even be mistaken in his perception of the danger. It was then the jury's prerogative to determine whether "a reasonably prudent person of ordinary firmness and courage" would have believed he was in immediate danger of death or bodily injury at the time of the shooting.

The video surveillance alone demonstrates most—if not all—of the elements of self-defense are absent here. Decedent was not charging at Jones, had no weapon drawn, and was not endangering anyone when Jones chose to get out of his car and shoot the Decedent twice before fleeing the scene. The evidence at trial simply did not support a jury charge instructing that a defendant "doesn't have to wait until his assailant gets the drop on him." For this and the other reasons discussed, we find the circuit court's instruction was properly tailored to the evidence, issues, and theories presented at trial.

**Conclusion**

For the foregoing reasons, Jones's murder conviction and sentence are

**AFFIRMED.**

**KONDUROS and VINSON, JJ., concur.**